1              IN THE UNITED STATES DISTRICT COURT

2              IN AND FOR THE DISTRICT OF DELAWARE

3                           - - -

4    PHARMASTEM THERAPEUTICS, INC.,    :  CIVIL ACTION
                                       :
5                   Plaintiff          :
                                       :
6              v.                      :
                                       :
7                                      :
     VIACELL, INC., et al.,            :
8                                      :
                 Defendants            :  NO. 02-148 (GMS)
9                           - - -

10                                     Wilmington, Delaware
11                                     Friday, August 6, 2004
                                       11:35 o'clock, a.m.
12                                     ***Telephone conference

13                          - - -

14   BEFORE:  HONORABLE GREGORY M. SLEET, U.S.D.C.J.

15                          - - -

16   APPEARANCES:

17              POTTER, ANDERSON & CORROON
                BY:  PHILIP A. ROVNER, ESQ.
18
                   -and-
19
                PERKINS COIE, LLP
20              BY:  PAUL J. ANDRE, ESQ. and
                     LISA KOBIALKA, ESQ.
21                   (Menlo Park, California)

22                   Counsel for Plaintiff

23

24                                     Valerie J. Gunning
                                       Official Court Reporter
25

EXHIBIT *1*

```
1   APPEARANCES (Continued):

2              RICHARDS, LAYTON & FINGER
               BY:  JEFFREY L. MOYER, ESQ.
3
                    -and-
4
               GOODWIN PROCTER, LLP
5              BY:  JOHN C. ENGLANDER, ESQ.,
                    JAMES McGARRY, ESQ. and
6                   ELAINE BLAZE, ESQ.
                    (Boston, Massachussetts)
7
                    Counsel for ViaCell, Inc.
8

9              MORRIS, JAMES, HITCHENS & WILLIAMS, LLP
               BY:  RICHARD K. KIRK, ESQ.
10
                        -and-
11
               PILLSBURY WINTHRIP, LLP
12             BY:  WILLIAM F. ABRAMS, ESQ.
                    (San Diego, California)
13
                    Counsel for CBR Systems, Inc.,
14                  f/k/a Cord Blood Registry, Inc.

15
               DILWORTH PAXSON, LLP
16             BY:  JAMES F. RODGERS, ESQ.
                    (Philadelphia, Pennsylvania)
17
                    Counsel for CorCell, Inc., Cryo-Cell and
18                  BirthCells

19                      - - -

20

21

22

23

24

25
```

1

2                    P R O C E E D I N G S

3

4                    (REPORTER'S NOTE:  The following telephone

5      conference was held in chambers, beginning at 11:35 a.m.)

6

7                    THE COURT:  Good morning.

8                    MR. KIRK:  Good morning, your Honor.

9                    THE COURT:  Counsel, is that you, Mr. Kirk?  Do I

10     recognize your voice?

11                   MR. KIRK:  It is, your Honor.

12                   THE COURT:  Do you want to start with

13     introductions?

14                   MR. KIRK:  I will be happy to start with

15     introductions from the defense side, your Honor.

16                   THE COURT:  All right.

17                   MR. KIRK:  This is Dick Kirk from Morris James

18     for defendant CBR.

19                   With me on the line I think in Delaware is

20     Jeff Moyer from Richards Layton, for ViaCell.  Also on

21     the line are John Englander from Goodwin Procter for

22     ViaCell, Jim Rodgers from Dilworth Paxson for CorCell and

23     Cryo-Cell.

24                   Is Bill Abrams on the phone yet?

25                   MR. ABRAMS:  I am.  I'm on the line.  Good

```
 1   morning.

 2             MR. KIRK:  And Bill Abrams from Pillsbury

 3   Winthrop, also for CBR.

 4             Am I missing any on the defense side?

 5             MR. McGARRY:  Jim McGarry and Elaine Blaze from

 6   Goodwin Procter.

 7             THE COURT:  Good morning, all.

 8             For the plaintiff.

 9             MR. ROVNER:  Good morning, your Honor.  This is

10   Phil Rovner from Potter Anderson on behalf of PharmaStem, and

11   with me on the line is Paul Andre and Lisa Kobialka from

12   Perkins Coie.

13             THE COURT:  Good morning.

14             MR. ANDRE:  Good morning, your Honor.

15             THE COURT:  All right.  Well, thanks for getting

16   together on such short notice.

17             As we all know, the defendants have collectively

18   moved the Court for an expedited briefing schedule and

19   hearing wherein they seek to obtain an order finding the

20   plaintiff in contempt of the Court's July 2 order.

21             Who's going to address this for the defendants?

22             MR. ENGLANDER:  I am, your Honor.  John

23   Englander.

24             THE COURT:  Okay.  Mr. Englander?

25             MR. ENGLANDER:  Do you want me to just go?
```

1          THE COURT:  Let's go.

2          MR. ENGLANDER:  Okay.  Your Honor, briefly, we

3     should start with the July 2nd order that we believe was

4     violated.

5          The context of that order was a letter sent out

6     on June 1st or thereabouts by PharmaStem, disseminated to

7     25,000 obstetricians.

8          That letter contained many false statements.

9     Among them, one that we highlighted was an actual statement

10    that the Court had ruled with respect to obstetrician

11    liability.

12         The letter had an immediate and substantial

13    impact on the industry.  Essentially, turmoil.  We had

14    obstetricians refusing to collect.  We had people who were

15    being -- who were giving birth and then found that they were

16    not going to get collected.

17         And in our view, your Honor, was that this was

18    PharmaStem's effort to essentially pressure the defendant

19    through the obstetricians, because the obstetricians would

20    then refuse to do business with us, to take a license, and

21    preempt the post-trial process that we're in.

22         The Court entered an order finding that the

23    June 1 letter was false.  That order set out particularly

24    limitations on contributory infringement that had been

25    omitted from statements in the letter.  And it concluded with

1    an order that there would be no more false or misleading

2    statements to obstetricians.

3            PharmaStem sought to vacate that order and also

4    specifically address parts of that order in its motion and

5    the Court did not vacate the order.

6            What we're seeking, your Honor, is really to

7    avoid having PharmaStem distribute yet another misleading

8    letter to the obstetricians.  Essentially, to preserve the

9    status quo while your Honor is considering the post-trial

10   motions from trial.

11           And that's our principal concern.  At this point,

12   the letter that, the August 2nd letter that's the subject of

13   this motion has been posted on PharmaStem's website.  We do

14   not know if they have also made a mailing like they did last

15   time, why they're distributing it to virtually all the

16   obstetricians in the country.

17           We believe that the August 2nd letter is

18   misleading.  I will start by saying that it is not as

19   directly false as the June 1 letter was.  But we believe the

20   paragraph that we've highlighted is intended to and does say

21   to obstetricians something that is very misleading, which is

22   that they can be liable simply for the collection of

23   umbilical cord blood.

24           And the paragraph that we've highlighted

25   in the August 2nd letter is in many ways very, very

1  similar to language that we also highlighted in the June 1

2  letter.

3      The letter essentially says, the paragraph that

4  we've highlighted essentially says that if you're an

5  obstetrician, you need a license to quote collect cord blood

6  or collect -- for the collection of umbilical cord blood, and

7  then couples that with a statement above it to the effect

8  that if you don't have such a license, you will be sued or

9  you are subject to being sued.

10      Your Honor, we submit that those statements

11  are misleading, and they are misleading in ways that

12  were directly anticipated by the Court's July 2nd order

13  in the sense that, now, the prior briefing indicated

14  that obstetricians cannot be liable under these method

15  claims for contributory infringement simply for collection.

16  At least they need to sell or offer to sell, at the very

17  least.

18      And also that they, the obstetricians,

19  it's -- the Court's order says that they can't be liable if

20  all they're doing is selling a service.  None of those

21  limitations are suggested in here, indicated in here,

22  reflected in here, in this August 2nd letter.  Its intent and

23  purpose is, once again, to put the obstetricians in fear that

24  simply collecting is sufficient, and in light of the briefing

25  and the Court's order, we believe that that is misleading and

1  a violation of the Court's order.

2      Essentially, your Honor, the point comes down to

3  this, which is PharmaStem is misusing its patents by claiming

4  threats that's not there and that the Court's orders at trial

5  indicated is not there, in order to exert improper leverage

6  on the defendants.

7      And what we're seeking is an order preventing

8  those, the dissemination of that kind of false statement.

9      THE COURT:  Okay.  Who's going to respond for

10  PharmaStem?

11      MR. ANDRE:  Your Honor, this is Paul Andre.

12      THE COURT:  Okay.

13      MR. ANDRE:  I will respond.

14      I'm a little confused because Mr. Englander just

15  ended with saying that it's a false statement, but earlier he

16  said it's not a false statement.

17      So let me just address --

18      THE COURT:  Well, I think he perhaps misspoke.

19  He did start out by indicating that he didn't believe that

20  the 8/2 statements of which he complains are as false as

21  those in the June 1 letter, but did go on to argue

22  essentially that they are misleading.

23      MR. ANDRE:  Let me give you a little bit of

24  background --

25      THE COURT:  Okay.

1          MR. ANDRE:    -- relating to the new laws, your

2    Honor.

3          There are several patents that issued during the

4    pendency of the cases in front of this Court.  Some of them

5    issued very late in the case and we did not add them into our

6    litigation against ViaCell and the other defendants at that

7    time because of the late nature of when they issued.

8          We have initiated several lawsuits around the

9    country, suing obstetricians against these two new patents

10   that were never before the Court here in Delaware.

11         In those complaints, we have alleged that

12   obstetricians either, they infringe, inducing infringement or

13   contributory infringement one or more of these patents.

14         We have sued numerous obstetricians on this.  We

15   believe it's something that a legal, viable theory and we

16   intend on pursuing these litigations.  There's nothing

17   misleading about the statement where it says, quite frankly,

18   that we have initiated lawsuits against obstetricians with

19   these patents and that our license agreement provide license

20   to obstetricians that license with cord blood banks.  That's

21   all true.

22         It's not -- Mr. Englander said we did not put

23   forward the elements of contributory infringement.  We're not

24   certain we're going after contributory infringement or the

25   obstetricians, to be quite frank.

1    I don't want to give up our legal theory, but we

2 do have issues of inducement to infringe as well.

3        So it is something that --

4        THE COURT: Let me ask you this, Mr. Andre:  Do

5 you believe that it's possible that in light of the June 1

6 mailing taken together, the August 2 posting -- by the way,

7 was this a mailing as well as a posting on the website?

8        MR. ANDRE:  I believe it was, your Honor, yes.

9        THE COURT:  Okay.  Was the 8/2 mailing to the

10 same physicians who received the 6/1 mailing, that is the

11 category of physicians known as obstetricians?

12        MR. ANDRE:  I believe that it was, your Honor.  I

13 don't know.  We were obviously not involved in this.  The

14 mailing service does this type of work for companies.

15        THE COURT:  Okay.  Would you concede the

16 possibility, if not the likelihood, that the combination of

17 the two mailings, if not one and/or the other alone, standing

18 alone, might have a chilling effect on the practice insofar

19 as it involves the collection of cord blood by these

20 physicians?

21        MR. ANDRE:  I would think not because we have 15

22 other companies that are licensing and that we have -- that

23 have made inroads throughout the nation and can facilitate

24 the collection of cord blood.

25        THE COURT:  So you think they would merely turn

1   to those other companies?

2          MR. ANDRE:  Absolutely.

3          THE COURT:  Okay.  Go ahead.  I'm sorry I

4   interrupted.

5          MR. ANDRE:  That's quite all right.

6          And I guess what would be important is to take a

7   step back.  What really prompted the June 1st mailing, which

8   was sent out by Mr. Didier, and we will concede that there

9   are perhaps a single word or two that could have been

10  clearer, but, you know, he gave his understanding as a

11  layperson, not as a lawyer, obviously.

12         But what had happened, after we had obtained this

13  jury verdict, the defendants in this case have been telling

14  all (inaudible), we've got numerous, I mean dozens and dozens

15  reports of this that the Court would not sustain this jury

16  verdict and that there was no need to worry.

17         So we actually wanted to put people on notice,

18  obstetricians and others, that these patents are -- have not

19  been overturned and that we intend to enforce them.

20         THE COURT:  So you're saying, your mailing, your

21  June 1 mailing, at least, was a reaction to a campaign by --

22  well, you did not use that word, I'm using it, but at least

23  statements by the defendants that the Court would not sustain

24  the verdict?

25         MR. ANDRE:  That's correct.  And so the June 1st

1   mailing went out.

2           I don't know if you notice in the letter we sent

3   to the Court yesterday, if you look at the amazing increase

4   in revenues and business that has resulted, it is pretty

5   astounding when you see the companies have increased their

6   growth rate of 83 percent in light of CBR, they have the

7   finding of willful infringement against them.

8           So they have been very aggressive in continuing

9   their marketing activities, telling all obstetricians and

10  anyone else who would listen, even pressuring our eventual

11  licensees not to take a license.

12          We have now licensed the entire industry but with

13  the exception of these defendants that we've sued in this new

14  realm of lawsuits.

15          And the June 1st letter went out.  Where it said

16  the Court ruled, it should have been the jury found that

17  infringement occurs.  That's a layperson's misunderstanding

18  more than anything else.

19          This new press release that was released on the

20  2nd is nothing -- is not unsimilar to any other press release

21  we've put out.  We had a, since the trial last November,

22  October, November, we had another lawsuit in the Northern

23  District of California where we named five cord blood banks

24  releasing exactly a press release that's almost identical to

25  what's in here.  Those five cord blood banks have taken

1  licenses.  We've dismissed that case.  We're going through

2  another round.

3          This is almost identical to what has been put

4  forward previously.  The only difference in this particular

5  case, we are suing obstetricians.

6          And it's something that they find problematic is

7  a quote from Mr. Didier saying that we prefer not to sue

8  obstetricians.  That's not something we would prefer.  We

9  prefer not to do that, but we have to protect our

10 intellectual property.

11         And then informing them there are licenses, they

12 are spelled out in the contracts, that if the obstetricians

13 have a license, pass through license to any other

14 obstetrician who uses a cord blood bank.

15         So it it does not have a chilling effect

16 whatsoever.  If you look at their growth rates, it's just the

17 opposite.

18              THE COURT:  Okay.  Mr. Englander?

19              MR. ROVNER:  Your Honor, this is Phil Rovner.

20         Before Mr. Englander speaks, can I just

21 address one of the procedural issues that occurred

22 during the defendants' first motion practice on this issue

23 on June 30?

24              THE COURT:  I'm not interested in talking about

25 procedure, Mr. Rovner, dating back to the -- does it have

1  relevance to the substance -- substantive issues we're

2  talking about right now?

3        MR. ROVNER:  Mr. Englander mentioned that we had

4  moved to vacate the order and that your Honor didn't grant

5  it.  That motion, as far as we understand it, is still

6  pending.

7        THE COURT:  That motion will remain pending, Mr.

8  Rovner, until I address it.  You're right.  That's correct.

9  But what does that add to the discussion of the substance is

10  my query to you.

11        MR. ROVNER:  Well, it --

12        THE COURT:  I mean, you're right, it corrects Mr.

13  Englander's statements.  You're right about that.  That

14  motion is still before the Court.

15        MR. ROVNER:  Okay.  Well, I just wanted that to

16  be clear because they moved for a TRO as well as a

17  preliminary injunction, and the TRO was granted by your Honor

18  as well as the preliminary injunction, but prior to the time

19  that we had an opportunity to respond.  And that is now fully

20  briefed.

21        THE COURT:  I'm aware of these things, Mr.

22  Rovner.

23        MR. ROVNER:  Okay.

24        THE COURT:  Again, is there a reason that you

25  felt it necessary to bring that to my attention right this

1    moment?

2           MR. ROVNER:  I just wanted the record to reflect

3    what the procedural --

4           THE COURT:  Mr. Englander, would you please reply

5    to Mr. Andre's substantive comments?

6           MR. ENGLANDER:  I will, your Honor.

7           I think what I said was that these statement in

8    the August 2 letter are not as directly false.  They are, we

9    believe, misleading on their own.

10          I think as well the Court's comment that in

11   combination with the prior letter, there is real misleading

12   effect here is right.

13          You know, there was a prior letter to these

14   25,000 people and now we hear those same people are getting

15   this additional letter that's simply going to compound what

16   they've already heard, which, you know, to the effect that

17   the Court has ruled with respect to obstetrician liability

18   and without any reference to the limitations on obstetrician

19   liability.

20          Now, Mr. Andre says that there hasn't been any

21   chilling effect from those letters.  Your Honor, I think the

22   record was replete in our last filing as to the effect of the

23   letters and it was immediate and it was very significant.

24          The Court Order of July 2nd allowed us with

25   respect to those people who contacted us to blunt the effect

1   of that letter.  But we don't know how many thousands of

2   obstetricians are worried, are concerned.  We know there were

3   many who immediately responded, including major practices who

4   started refusing to collect.

5           This letter is going to compound that.  That's

6   why we're here, your Honor, because there's a very

7   significant concern on the part of all defendants, based on

8   the track record that this letter, which we now learned has

9   been sent out, is going to cause significant, immediate

10  irreparable harm, both to us and to people whose collections

11  are at issue.

12          Mr. Andre suggests that all that's going to

13  happen is these people will go to the other licensees.  I

14  don't know where that comes from.  There's certainly no

15  evidence that that is happening in major part.

16          My understanding is the four defendants

17  before the Court still represent roughly 80 percent of

18  the market here.  So I don't think that it's, you know,

19  glibly saying, which, of course, is their intent, that

20  these people will just go to the competition.  That

21  wasn't what happened last time and there's no evidence

22  that that is going to happen.

23          Mr. Andre commented that the patent that the

24  obstetricians have been sued on is not the same as the '553.

25          Your Honor, the '427 patent, which we attached,

1    has essentially the same claims as the '553. And in fact,

2    there was litigation over this patent before you in advance

3    of trial because they wanted to talk about it as evidence.

4    And during that litigation, Mr. Andre represented to the

5    Court that the '427 claims were essentially the same as the

6    '553 claims and handed up a chart to that effect. I believe

7    it's in the transcript.

8              The last thing I want to talk about, Mr. Andre

9    indicated that the June 1 letter was a response to the

10    defendants telling people that the Court would not sustain

11    the verdict.

12             Again, there's no evidence in the record, and

13    they filed a very lengthy response back in July about this,

14    no evidence that that is why they sent their letter, that the

15    defendants were saying that. And I can say on behalf of

16    ViaCell, ViaCell has filed an S1 in the meantime and I

17    believe the S1 is pretty accurate in saying what the risks

18    are with respect to the jury verdict and what may come of

19    that jury verdict.

20             So this may have happened, but certainly this

21    is the first time that this excuse has been offered by the

22    plaintiff for the nature of the correspondence that they've

23    directed at the obstetricians.

24             THE COURT:  Mr. Andre?

25             MR. ANDRE:  Yes.  I guess what Mr. Englander and

1    the defendants are complaining about is that the -- this

2    press release, the August 2nd press release has a potential

3    of giving obstetricians the notification that they may be

4    held liable for collecting cord blood banks from unlicensed

5    cord blood -- collecting cord blood for unlicensed cord blood

6    banks.

7            And that is exactly true.  We are suing

8    obstetricians for doing exactly that.  There is a potential

9    of liability.  That's not misleading; that is an absolute

10   truth.

11           We are going to continue to find obstetricians

12   who collect for unlicensed cord blood banks and sue them.

13   And we have not only a right, we have an obligation to put

14   people on notice of these patents, because if you don't give

15   them proper notice and the idea there might be potential

16   liability, you cannot expect them to stop their behavior.

17   And that's an obligation of a patentee.

18           Now, Mr. Englander said the Court has not ruled

19   regarding obstetrician liability.  That's correct.  We did

20   not bring that forward in the Court in Delaware.  We will be

21   bringing that forward in the five courts in which we filed

22   these lawsuits.  It is a very real possibility, and from our

23   point of view, a very real probability that obstetricians

24   will be held liable for patent infringement, asserting one of

25   the theories of patent infringement that I talked about

1 earlier.

2          With respect to the '427 patent that Mr.

3 Englander mentioned, I did bring it to the Court's attention,

4 brought one single claim to the Court's attention.

5          There are numerous claims in this patent and

6 claims that are -- that were not before the Court in

7 Delaware, claims we intend on pursuing in the new cases, and

8 that are substantially different than the cases that have

9 been tried already, and would need further claim construction

10 to boot.

11          So the fact that there is a single similar claim

12 that led to this patent having a terminal disclaimer to the

13 '553 to avoid any type of double-patenting issues is

14 irrelevant to the fact that we have a new lawsuit with new

15 defendants and new claims that we will be pursuing.

16          So to say that this press release that went out

17 on August 2nd is misleading is incorrect.  It's not

18 misleading.  It's telling the absolute truth.  It is

19 conveying a message, obstetricians can be sued for patent

20 infringement, and they have been, and they will continue

21 being sued for patent infringement if we find out about them

22 infringing our patent.

23          THE COURT:  Mr. --

24          MR. ANDRE:  I don't know how else to notify

25 obstetricians about these patents pursuant to our duty as

1  patentee and I don't know how, you know, how we can make this

2  press release, you know, informing the public about these new

3  lawsuits any more benign.

4          There's nothing in the statement even that Mr.

5  Englander read, the paragraph they highlighted.  I don't know

6  if it's in front of the Court?

7          THE COURT:  Yes, it is.

8          MR. ANDRE:  I don't know how that can be made any

9  more benign or any more correct than it is.

10          THE COURT:  Mr. Englander, you do, at Page 7 of

11  your memorandum, point out that you, the defendants

12  collectively, do not complain about the announcement of these

13  lawsuits.  And Mr. Andre points out in his recent remarks

14  that they are, in point of fact, they have initiated lawsuits

15  against obstetricians on a theory.

16          I'm not sure what the theory is.  I'm not sure

17  that I need to know at this point.  But that that is merely a

18  statement of fact, and you don't complain about the fact of

19  the announcement of the lawsuits.  Why, then, do you complain

20  of obstetricians, suits against obstetricians and others?

21  What is it that you complain -- go ahead.

22          MR. ENGLANDER:  Your Honor, I think that the

23  reason that we are not complaining here about the

24  announcement of the lawsuits is because our understanding of

25  the law is that they can announce the existence of a lawsuit

1    provided they do so in good faith.

2    But, your Honor, what we're trying to focus on

3    is a paragraph below the two paragraphs that talk about the

4    lawsuit.

5    THE COURT:  I understand that.  The language

6    that's in quotes.  While we would prefer not to sue.

7    MR. ENGLANDER:  And I think, if I could, because

8    I think that, you know, we don't think they can assert a

9    lawsuit against an obstetrician in good faith, your Honor,

10   especially based on what has gone on in your courtroom and

11   rulings that you made with respect to jury instructions.  But

12   Mr. Andre says differently and we understand that that is not

13   what the Court wants to rule on.

14   THE COURT:  Right.  And that issue has not been

15   teed up for me.

16   MR. ENGLANDER:  Right.  And what we're focusing

17   on is really what I perceive, I think, as thumbing their nose

18   at the Court Order in this sense:  The one thing that we made

19   clear in our documents previously was that their letter of

20   June 1 suggests that obstetricians can be liable simply for

21   collecting cord blood and that that is inaccurate.

22   THE COURT:  And that's one of the reasons that

23   caused me to sign and issue the order.

24   MR. ENGLANDER:  And they are saying the same

25   thing in that paragraph.  They're saying it very craftily,

1  but they are saying the same thing because they talk about

2  getting a license for the collection of umbilical cord blood

3  and they do it without reference to the limitations which

4  your Honor is well aware of and which are in that Order and

5  which they are well aware of.

6          And Mr. Andre says I don't know how I could have

7  done this any more benignly.  Well, how about telling the

8  truth?  How about being accurate?  How about reflecting to

9  the world that there is at least a disagreement as to whether

10 obstetricians can be liable for the collection of umbilical

11 cord blood?  That there are limitations on contributory

12 infringement?

13         There's no doubt that there is no direct

14 liability for patent infringement under the '427 or the

15 '553.  Obstetricians simply do not perform all the steps of

16 any of those, and I don't think Mr. Andre is suggesting

17 that.

18         So there are only two other theories on

19 which they could be liable:  Contributory infringement

20 and now Mr. Andre is suggesting inducing infringement

21 for the first time, your Honor.  We heard it today for the

22 first time.

23         As to contributory infringement, we've been over

24 and over this.  Your Honor has been over it and your Honor

25 has indicated what your views on it.  And for them to leave

1   that out, especially in light of the order, we think is

2   misleading.  We think it's in contempt.

3          The suggestion that they get around it because

4   some obstetrician somewhere might have been involved in

5   inducing infringement I think is a very weak argument, your

6   Honor.

7          THE COURT:  Okay.

8          MR. ENGLANDER:  If they wanted to make this

9   accurate, they could have.  But they didn't, because what

10  they want to do is leave the obstetricians, the general

11  25,000 obstetricians not familiar with the litigation before

12  your court in fear that they will be liable simply for

13  collecting cord blood.

14         THE COURT:  Mr. Andre?

15         MR. ANDRE:  Your Honor, once again, Mr.

16  Englander -- I don't see where he's pointing to in the press

17  release because I mean that is the issue here.

18         THE COURT:  Well, look at -- I think if you --

19         MR. ENGLANDER:  It's the last sentence of the

20  third paragraph coupled with the reference in the first

21  phrase to the fact that we would prefer not to sue.

22         MR. ANDRE:  Yes.  PharmaStem's license agreements

23  provide a license to obstetricians and health care providers

24  for the collection of umbilical cord blood provided they work

25  with licensed banks.  That's a true statement.

1         MR. ENGLANDER:  I actually think it's probably

2    inaccurate, the license for the collection of umbilical cord

3    blood.

4         Getting past that, standing alone, even if it's

5    accurate, our view is together, in a crafty paragraph, what

6    you are saying is you need a license to collect umbilical

7    cord blood.  If you don't, you will be sued.

8         MR. ANDRE:  We are suing obstetricians, that is

9    correct.  And our theory with two new patents that are not

10   before the Delaware Court, but these two patents are theories

11   of infringement that have been alleged in the complaint are

12   direct inducement and/or contributory.

13        We believe that, at the very least, we have very

14   strong evidence of inducement to infringe.

15        Now, in a press release, I don't think we have

16   put forward all of our legal theories.

17        In your Honor's July 2nd order, the order is very

18   clear.  It says you shall not make false or misleading

19   statements to obstetricians.

20        THE COURT:  That's true.

21        MR. ANDRE:  And we have not made false or

22   misleading statements.

23        The order states that the missing elements for

24   contributory infringement are that you must list three

25   elements in that order, required for contributory

1    infringement.

2           Well, at this point, we're not certain we're

3    going to be alleging contributory infringement against these

4    obstetricians.  We have alleged the various acts of

5    infringement and we believe we have good cases of inducement

6    to infringe.

7           THE COURT:  Mr. Andre, let me interrupt for a

8    second.  I will let you go again.

9           MR. ANDRE:  Sure.

10          THE COURT:  But I am troubled by the context,

11   and as they say, the totality of the circumstances.  And what

12   I mean by that is I think I've alluded to it earlier:  The

13   June 1 letter and this release and the particular statement

14   or paragraphs that we're talking about right now.

15          I think that you are correct:  That it is my view

16   at this stage of this discussion that PharmaStem is probably

17   not in contempt of the Court's July 2 order.  You point out

18   that the order was directed or directed PharmaStem -- it was

19   directed to letters to obstetricians, number one.

20          This August 2 press release is not directed in

21   the same fashion.  It's at least for that reason, and perhaps

22   others, that it would be, I think, prudent for the Court to

23   consider this as a motion to amend the July 2 order rather

24   than to find PharmaStem in contempt of that order.

25          Having said that, regardless of how the motion is

1  styled, I still have the concern, Mr. Andre, that when read

2  by the same group of physicians, you know, the same

3  practitioners that you mailed to back in June when the 8/2

4  release is read, when it comes in the mail or they visit the

5  website, that it's going to have a similarly chilling effect,

6  which I felt under the circumstances, for the reasons

7  articulated in the order, was inappropriate.

8          I think you are probably right:  That the

9  statement that we're talking about in the 8/2 release doesn't

10  offend or does not mislead or isn't false to the same degree

11  that the June 1 statement did.

12          But I think that Mr. Englander is correct in

13  that, without setting forth necessarily or revealing your

14  theory of the case or the cases against whomever you elect to

15  bring them, that as you put it, a more benign or a perhaps

16  more accurate statement could have been made and perhaps can

17  be made that would not have as a chilling effect.  It's going

18  to have a chilling effect.  I've got to believe particularly

19  large groups are going to be running to their lawyers to try

20  to figure out whether they can collect, safely collect cord

21  blood.  And that remains an issue extant that has been, as

22  you all know, joined before this Court and is being

23  considered presently.

24          I understand the need for the marketplace to

25  continue.  Things do not necessarily come to a grinding halt

1    when you walk into a courtroom, but you are in litigation,

2    all the parties on this line, and, unfortunately, perhaps, or

3    maybe fortunately, that is a deliberate process.  Maybe

4    altogether too deliberate for all concerned here.  But it is

5    what it is, and it's going to take the time it takes.

6         My feeling is that parties on both sides should

7    do what they can to move cautiously forward in your efforts

8    to market your products and your services without involving

9    the Court as, or attempting to utilize the win or the loss as

10    an imprimatur, as a shield or a sword, in those efforts.  I

11    think it's a dangerous game you play, and you play it at your

12    peril, both of you.

13         So I'm interested in knowing what, if anything,

14    you can conceive among you that you can do about this release

15    that will accommodate PharmaStem's right to announce, in good

16    faith, the existence of lawsuits and its intent to protect

17    its intellectual property rights while at the same time not

18    interfering with this Court's process and interfering with

19    the ability of potential consumers out there, obstetricians

20    and patients, to collect cord blood in an appropriate way.

21         MR. ANDRE:  Your Honor, this is Paul Andre once

22    again.

23         THE COURT:  Yes?

24         MR. ANDRE:  I appreciate the Court's comments and

25    we obviously, PharmaStem has a very large interest in the

1    continued collection of cord blood.  That's how we derive our

2    revenues, licensing.

3              THE COURT:  Sure.

4              MR. ANDRE:  We have, as you can see on the press

5    release, 15 licensees, licensed the entire industry with the

6    exception of the defendants.  We want them to collect as much

7    as possible.  We want them to be very successful.

8              The defendants are saying it has a chilling

9    effect on their business by us suing them and suing

10   obstetricians who we believe work with them.

11             If it has a chilling effect on them, that is not

12   necessarily relevant one way or the other, because the

13   industry is being serviced by these 15 defendants.

14             We want the -- our licensees to be protected.  In

15   fact, we have obligations to our licensees.

16             These people are paying a royalty to us to use

17   the technology in the patent whereas other companies who are

18   not paying such a royalty are continuing and they're

19   competitors.  They're at a competitive disadvantage because

20   of that.

21             So whereas -- you know, our goal is not to

22   interfere with this Court's process.  That's the reason the

23   patents that are in this press release, that are in this

24   lawsuit, are not the patents that are in front of the Court.

25   This lawsuit is very distinguishable from the Court.  There

1    will be new legal theories, we are doing what we can to

2    protect our intellectual property and to protect our

3    licensees.

4         We also, regretfully, are suing obstetricians.

5    This is not something we want to do.  We would rather not do

6    this.  But, nonetheless, we have to protect our intellectual

7    property and we will continue doing so.

8         If it has a chill effect on the unlicensed

9    cord bloods business, then that's an unfortunate consequence

10   of the unlicensed cord blood banks refusing to take a

11   license.

12        THE COURT:  What about the obstetricians and

13   patients who want to have -- who cannot have their cord blood

14   collect as a result of, or may elect not to as a result of

15   reading this release?

16        MR. ANDRE:  I think there are, like I said, there

17   are numerous opportunities.  And that was the purpose of this

18   release and defending the -- the letter actually informs

19   obstetricians that they don't need to worry.  They won't be

20   sued if they use these 15 companies.  And they find that

21   offensive, and that is -- it's something that we are trying

22   to keep the obstetricians, let them know, keep collecting,

23   this is a good thing.

24        MR. ENGLANDER:  Your Honor --

25        THE COURT:  Yes?

1    MR. ENGLANDER:  -- I heard what you said and I

2 think, to some extent, you were suggesting could the parties

3 get together and agree on something.

4    THE COURT:  Yes.

5    MR. ENGLANDER:  And I have some ideas on that and

6 I would be happy to try, but my sense is perhaps that there's

7 no receptivity on the other side.  And if this letter has

8 already gone out, I'm not sure what can be done.

9    THE COURT:  Well, the letter is gone and --

10    MR. ENGLANDER:  And directly to 25,000

11 obstetricians, apparently.

12    THE COURT:  Yes.

13    MR. ENGLANDER:  And we know what's going to

14 happen next.  Our phones are going to start ringing.

15    And I mean we can certainly think about what we

16 think would bring this back to neutral, if you will, because

17 I understand that to be what the Court is saying.

18    THE COURT:  Yes.  That's what I am saying.

19    MR. ENGLANDER:  Move forward --

20    THE COURT:  That's where it needs to be.  It

21 needs to be a neutral and the parties need to recognize that

22 you are in a litigation process that you need to have

23 patience with.

24    I understand, Mr. Andre, that, you know, the

25 business your client is in, but this is the American justice

1    system, and this is the way it works.  And I do, quite

2    frankly, believe that things like this, and I mean by that

3    the 8/2 release, tend to interfere with the deliberative

4    processes.  At least I have that feeling about my deliberate

5    process insofar as the case before me is concerned.

6              And I am not as much concerned as you seem to be

7    focusing on the profits of the defendants.  I am very much

8    concerned about obstetricians and families being threatened

9    in a way that's going to cause them, perhaps improperly, that

10   has not been decided yet, to lose a once-in-a-lifetime

11   opportunity.  That's the classic definition of irreparable

12   harm.

13             Go ahead.

14             MR. ANDRE:  I agree, your Honor.  It's something

15   that we do not want to have that chill effect.  We want to

16   let obstetricians know and families, whoever reads this, that

17   there are viable alternatives, and that they have a license.

18             THE COURT:  Well, is there any -- does

19   PharmaStem, Mr. Andre, believe that it would be possible to

20   amend this language in a way that would satisfy the needs and

21   concerns of all of the entities at the table, or is that just

22   something that you don't think is worth discussing?

23             MR. ANDRE:  Well, we're always open, your Honor,

24   of course, to any kind of discussion.  I don't know what -- I

25   would have a hard time because this is a press release that,

1    like I said, was attempted to be -- not have the chill effect

2    on the obstetrician community or the people who would want to

3    have this once-in-a-lifetime opportunity.

4    THE COURT:  Well, if both views are considered,

5    albeit perhaps not accepted, considered for purposes, at

6    least, of a limited period of time while the Court resolves

7    at least in Delaware the issues before it, it may be that --

8    there are a lot of smart people on this phone call that you

9    can come up with with some language that would at least

10   provide a temporary solution, if not a permanent one.

11   I'm not saying that one or the other of you would

12   have to, collective defendants on the one hand and PharmaStem

13   on the other, would have to necessarily accept the theory

14   that might underlie the particular language that you are able

15   to agree upon.

16   But I hope that the Court's concerns are going to

17   be taken seriously.  And if you are willing to talk --

18   MR. ANDRE:  Your Honor, we're always willing.  If

19   Mr. Englander or any of the other defendants' counsel would

20   prefer to, like to give us language, we would definitely

21   consider it, and obviously if it was language we found

22   acceptable, we'd post it on the website and put it in a press

23   release.  We have no problem with that.

24   MR. ENGLANDER:  But not send it out to the 25,000

25   people?

1              MR. ANDRE:  Pardon me?

2              MR. ENGLANDER:  But not send out another

3    mailing?

4              MR. ANDRE:  Well, if there's a possibility --

5              MR. ENGLANDER:  That -- that may be acceptable,

6    Paul.

7              MR. ANDRE:  We're very agreeable.

8         We have to let the obstetricians know that we're

9    not going to sue them if they use one of these 15 licensed

10   banks.  If they are using a bank that's not licensed, whether

11   it be the defendants' --

12             THE COURT:  Let's do this, Mr. Andre.  Let's do

13   this.  Let give counsel an opportunity to talk.

14             MR. ANDRE:  Okay.

15             THE COURT:  Okay?  The Court will hold this

16   matter under advisement.  The problem -- the reason, one of

17   the reasons I wanted to get on the phone with you so quickly

18   without, with apologies to PharmaStem, giving you the

19   opportunity for a written response, is that I'm about to

20   leave.  Today is my last day in the office for the next

21   couple of weeks.  And, believe me, I won't be addressing

22   PharmaStem and ViaCell.

23             MR. ANDRE:  Let's hope not.

24        Your Honor, I assume I can talk to Mr. Englander,

25   Mr. Abrams and Mr. Rodgers and any other counsel that we need

1   to talk to.

2            THE COURT:  Sure.

3            MR. ANDRE:  Can we assume for the purposes of

4   this discussion that the opposition briefing to this motion

5   is stayed --

6            THE COURT:  Yes.

7            MR. ANDRE:  -- until we get back with your

8   Honor?

9            THE COURT:  Yes.  If you want to try to get back

10   on the phone with me today, we might be able to do that.  I

11   don't know what your schedules are like and how much time

12   counsel are going to be able to devote to this issue.  But

13   this would be the last opportunity you're going to have to

14   talk with me about it for the next couple of weeks.

15            MR. ENGLANDER:  Well, we'll certainly try to do

16   that, your Honor.

17            THE COURT:  Okay.

18            MR. ENGLANDER:  Because I guess my suspicion is

19   that we will have difficulty coming to agreement and we may

20   wind up having to ask the Court to do something in the way of

21   an order instead.  And I know that's not the Court's desire

22   and we're going to do our best to have that not happen.

23            MR. ENGLANDER:  Well, it is not the Court's best

24   wish.  And, again, I want to remind you, Mr. Englander, that

25   I am not inclined to a finding of contempt under the

1   circumstances.  I may be inclined to a different type of

2   order or request.

3               MR. ENGLANDER:  Understood, your Honor.

4               THE COURT:  All right, then, counsel.  If you are

5   able to reach an accord or not, you probably, either way,

6   should get in touch with Ms. Tyre-Daley and let us know

7   whether you can and want to get back on the phone today.

8   Otherwise, we will be looking at this at some date in the

9   near term.

10              MR. ENGLANDER:  Thank you, your Honor.

11              THE COURT:  And, Mr. Rovner, the motion to

12  dissolve will continue to be held in its present status of

13  abeyance.  Okay?

14              MR. ROVNER:  Thank you, your Honor.

15              THE COURT:  All right.  Take care, counsel.

16              (Counsel respond "Thank you, your Honor.")

17              (Telephone conference concluded at 12:20 p.m.)

18                       - - -

19

20

21

22

23

24

25