1

1                    IN THE UNITED STATES DISTRICT COURT

2                    IN AND FOR THE DISTRICT OF DELAWARE

3                                   - - -

4     PHARMASTEM THERAPEUTICS,          :        Civil Action
      INC.,                             :
5                                       :
                Plaintiff,              :
6                                       :
          v.                            :
7                                       :
      VIACELL, INC., CRYO-CELL          :
8     INTERNATIONAL, INC., CORCELL,     :
      INC., STEMCYTE, INC., CBR         :
9     SYSTEMS, INC., f/k/a CORD BLOOD   :
      REGISTRY, INC., BIRTHCELLS        :
10    TECHNOLOGY, INC., NUSTEM          :
      TECHNOLOGIES, INC., and           :
11    BIO-CELL, INC.,                   :
                                        :
12              Defendants.             :        No. 02-148-GMS

13                                   - - -

14    VIACELL, INC., CRYO-CELL          :        Civil Action
      INTERNATIONAL, INC. and           :
15    CORCELL, INC.,                    :
                                        :
16              Plaintiffs,             :
                                        :
17        v.                            :
                                        :
18    PHARMASTEM THERAPEUTICS,          :
      INC.,                             :
19                                      :
                Defendants.             :        No. 04-1335-GMS
20
                                     - - -
21
                         Wilmington, Delaware
22                   Wednesday, November 3, 2004
                            10:00 a.m.
23
                                     - - -
24
      BEFORE:   HONORABLE GREGORY M. SLEET, U.S.D.C.J.
25

2

```
1    APPEARANCES:

2            PHILIP A. ROVNER, ESQ.
             Potter Anderson & Corroon LLP
3                    -and-
             PAUL J. ANDRE, ESQ.
4            Perkins Coie LLP
             (Menlo Park, California)
5
                     Counsel for Plaintiff
6
             JEFFREY L. MOYER, ESQ.
7            Richards, Layton & Finger
                     -and-
8            PAUL F. WARE, ESQ.,
             JOHN ENGLANDER, ESQ.,
9            CHRIS HOLDING, ESQ., and
             ELAINE BLAIS, ESQ.
10           Goodwin Procter LLP
             (Boston, MA)
11
                     Counsel for ViaCell
12
             RICHARD D. KIRK, ESQ.
13           Morris, James, Hitchens, & Williams LLP
                     -and-
14           WILLIAM F. ABRAMS, ESQ., and
             THOMAS CHAFFIN, ESQ.
15           Pillsbury Winthrop LLP
             (Palo Alto, California)
16
                     Counsel for CBR Systems, Inc.
17                   F/k/a Cord Blood Registry, Inc.

18           JAMES J. RODGERS, ESQ., and
             EVELYN H. McCONATHY, ESQ.
19           Dilworth Paxson LLP
             (Philadelphia, PA)
20
                     Counsel for Defendant CorCell, Inc.
21

22                        - - -

23

24

25
```

3

1                                    INDEX

2                    Preliminaries --------------------- Page 5

3                    Opening Remarks, Mr. Ware --------- Page 13

4    WITNESS

5    NICHOLAS S. DIDIER

6                    Direct examination ---------------- Page 16
                     Cross-examination ----------------- Page 75
7                    Redirect examination ------------- Page 94
                     Recross-examination -------------- Page 101
8

     SUSAN CHRISTOPHER
9
                     Direct examination ---------------- Page 104
10                   Cross-examination ----------------- Page 110
                     Redirect examination ------------- Page 116
11
                     Argument, Mr. Ware --------------- Page 130
12
                     Reply, Mr. Andre ----------------- Page 148
13
                     Response, Mr. Ware --------------- Page 162
14

     CONTEMPT ARGUMENT
15
                     Argument, Mr. Englander ---------- Page 168
16
                     Reply, Mr. Andre ----------------- Page 183
17
                     Response, Mr. Englander ---------- Page 203
18

     PHARMASTEM'S MOTION
19
                     Argument, Mr. Andre -------------- Page 207
20
                     Reply, Mr. Englander ------------- Page 233
21
                     Mr. Rodgers ---------------------- Page 244
22
                     Mr. Abrams ----------------------- Page 245
23
                     Reply, Mr. Andre ----------------- Page 246
24

25

4

```
 1                          EXHIBITS

 2    1, 2, 4, 5
      5A, 5B, 5C,
 3    7, 7A, 13,
      15, 15A, 15B,
 4    15C, 17, 18
      18A, 20, 21                                    Page 119
 5
      22          Amnesty Agreement Forms            Page 74
 6
      23          Set of Amnesty Agreements          Page 74
 7
      24          Face Page of Mailing List          Page 75
 8
      26          Affidavit of Eric Gould            Page 118
 9
      25          Affidavit of Chris Adams
10
                           - - -
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

5

```
1              THE COURT:  Good morning, counsel.  Please be

2    seated.

3              (Counsel respond "Good morning.")

4              THE COURT:  We have all spent a considerable

5    amount of time together in the past.  Why don't we for the

6    record begin with introductions.  Mr. Rovner, with Mr.

7    Andre?

8              MR. ROVNER:  Philip Rovner from Potter Anderson

9    for PharmaStem.  With me is Paul Andre from Perkins Coie.

10             THE COURT:  Welcome back.

11             Mr. Moyer.

12             MR. MOYER:  Good morning, Your Honor.  Jeff Moyer

13   on behalf of ViaCell.  This morning we have Paul Ware, John

14   Englander, Chris Holding, as well as Elaine Blais from the

15   Goodwin Procter firm in Boston, for ViaCell.

16             MR. KIRK:  Good morning, Your Honor.  Richard

17   Kirk from Morris James Hitchens & Williams for CBR Systems.

18   With me are Bill Abrams and Tom Chaffin from Pillsbury

19   Winthrop.

20             MR. RODGERS:  James Rodgers from Dilworth Paxson

21   for Cryo-Cell and CorCell.  With me is Evelyn McConathy.

22             THE COURT:  The Court would note the absence of

23   James Rehnquist and ask that, Mr. Ware and Mr. Englander, you

24   convey the Court's best wishes to him.

25             We have, I think, allotted several hours.  We
```

17

Didier - direct

1    New York?

2    A.    The headquarters are in Wayne, Pennsylvania.  And we

3    have an operating facility in Larchmont, New York.

4    Q.    What happens at the headquarters in Wayne,

5    Pennsylvania, if anything, in terms of operations?

6    A.    Daily operations.  Nothing.

7    Q.    Say that again?

8    A.    I was saying, from a daily operations perspective,

9    nothing.

10    Q.    And is the Wayne, Pennsylvania office an office of one

11    of the investors?  Is that the nub of it?

12    A.    That is correct.

13    Q.    But there is no -- the company is not run from that

14    office?  To the extent you are the operating head of the

15    company, all of that work is carried out in Larchmont, New

16    York.  Is that correct?

17    A.    That is correct.

18    Q.    Can you tell us whether or not the company has realized

19    any revenues from these amnesty agreements?

20    A.    The company has not realized revenues from the amnesty

21    agreements.

22    Q.    Has the company realized any revenue from the license

23    agreements with the 16 cord blood companies whom I understand

24    you to have licensed?

25    A.    Of course.

18
Didier - direct

1    Q.    Can you tell us, through today, for the most recent

2    quarters for which you have figures, what the total revenue

3    realized under those license agreements has been, gross

4    revenue?

5    A.    I am sorry.  Can you repeat your question?  Because I

6    am not sure whether you said gross revenues in total or are

7    you specifically referring to a quarter?  Quarter revenues?

8    Q.    I am asking for the aggregate revenues attendant to all

9    of the license agreements with the 16 cord blood banks that I

10   understand you to have licensed.

11   A.    I would say probably between -- around one

12   million-five.

13   Q.    Does that take us through September 30, 2004, or are

14   those figures even more recent?

15   A.    That would be through September 30.

16   Q.    You recall having sent a letter dated June 1, 2004, to

17   obstetricians?

18   A.    I do.

19   Q.    If you turn to Tab 1, Exhibit 1, in the book before

20   you, am I correct that that is a copy of the letter that you

21   sent to physicians on that occasion?

22   A.    Yes, it is.

23   Q.    In the second paragraph -- actually the first

24   paragraph, it talks about, We have been asked by, quote,

25   "concerned colleagues."  What is that a reference to?  Were

21
Didier - direct

1   with respect to obstetricians.  Isn't that so?

2   A.    That is correct.

3   Q.    And this language, too, was the subject of the Court's

4   order of July 2nd, indicating to you, or making a finding

5   that this reference was misleading.  Correct?

6   A.    That is correct.

7   Q.    When you sent the letter of June 1, 2004, did you send

8   it to a commercially available list of physicians?

9   A.    Yes.  We had the list of physicians we sent it to.

10  Q.    How did you obtain that list?

11  A.    We obtained that list through our distribution

12  facility.

13  Q.    What do you mean by that, through your distribution

14  facility?

15  A.    The mail house.

16  Q.    All right.  What is the name of the mail house that you

17  contacted for this list?

18  A.    I don't recall the name right now.

19  Q.    You have used that mail house several times now, have

20  you not?

21  A.    That is correct.

22  Q.    You made the June 1, 2004 mailing to about 25,000

23  physicians.  Is that correct?

24  A.    That is correct.

25  Q.    Did you make it to more physicians or entities than the

22

Didier - direct

1    25,000?

2    A.    No.   It was about 25,000.

3    Q.    And you made a subsequent mailing in or around August

4    20th, 2004, which attached the amnesty agreement?

5    A.    That is correct.

6    Q.    That was also to a group of about 25,000 OB/GYNs.   Is

7    that correct?

8    A.    Same list.

9    Q.    The same list.   And didn't you, in between, communicate

10   a press release to that same list in or around August 2nd?

11   A.    I believe that is correct, yes.

12   Q.    Are you aware of any other mailings, that is, other

13   than those three, to that list of 25,000 physicians?

14   A.    I am not aware.

15   Q.    You are not aware of any or you don't know one way or

16   the other?

17   A.    I don't know one way or the other.   But we definitely

18   didn't send any other mailings.   So if other parties may have

19   sent other mailings, that is different.   But we did not,

20   PharmaStem did not.

21   Q.    I am asking only about PharmaStem's use of that list.

22   You are telling us, as I understand it, you have three

23   mailings.   Correct?

24   A.    That's correct.

25   Q.    In each instance to a universe of about 25,000 doctors?

29

Didier - direct

1   practicing.  Others come and practice.  So a list at one

2   point in time is never a perfect list.

3   Q.    Those are assumptions you made, knowledge you had, at

4   the time you did both mailings.  Correct?  That's what you

5   are saying?

6   A.    That is correct.

7   Q.    So it follows, does it not, that with respect to the

8   mailing of the August 20th letter, you knew it was being sent

9   to people to whom it wouldn't apply.  Right?

10  A.    That could be the case, yes.

11  Q.    Not only could it be the case, you knew it would be the

12  case.  Correct?

13  A.    We would not --

14  Q.    Mr. Didier, please, you knew when you sent the August

15  20th letter that it would be received by some number of

16  physicians who weren't practicing medicine anymore or who

17  didn't do cord blood collection at all.  Isn't that so?

18  A.    That is correct.

19  Q.    So you knew that some universe of physicians receiving

20  the letter should not be asked to sign the amnesty

21  agreement.  Isn't that true?

22  A.    That is correct.

23  Q.    But, in fact, you accepted contracts even from

24  physicians who were not in practice or no longer collecting

25  cord blood.  Isn't that true?

39

Didier - direct

1   office.  This is obviously a photocopying error.

2   BY MR. WARE:

3   Q.    The following documents, numbered 190, Dr. Ravitz says

4   I gave up obstetrics in 1996.  I have never participated in

5   any of these programs.

6           Do you see that?

7   A.    Yes.

8   Q.    The next document, Dr. Hilaman, the number is 31, I do

9   not do OB or offer any sampling from any lab.

10          And I won't go through the rest of these.

11          In any event, when you received these documents,

12  you were clear at that time that the list you had was

13  reaching an audience of physicians that you didn't need to

14  reach in part.  Is that correct?

15  A.    That is correct.

16  Q.    I think just prior to the August 20 letter or earlier

17  in the month you had brought suit against a number of OBs.

18  Isn't that so?

19  A.    Yes.

20  Q.    And following that suit, if you will turn to Exhibit 4

21  in the notebook -- actually, backwards one, you communicated

22  with a number of those physicians, did you not?

23  A.    Yes.

24  Q.    And you asked them to settle the lawsuit.  Isn't that

25  so?

40

Didier - direct

1   A.     That is correct.

2   Q.     And the terms on which you were prepared to settle was

3   that they had to agree not to collect cord blood.  Isn't that

4   correct?

5               MR. ANDRE:  Your Honor, may I lodge an

6   objection.  Under Federal Rules of Evidence 408, the

7   settlement discussions that Mr. Didier had with other

8   defendants in cases are protected from evidence and should

9   not be held against PharmaStem in these proceedings.

10              THE COURT:  Mr. Ware.

11              MR. WARE:  Your Honor, Rule 408 may obtain as

12  regards a proceeding between the settling party and the

13  plaintiff.  It has nothing to do with the admissibility of

14  this document in a different proceeding for the purposes for

15  which it is offered here.

16              MR. ANDRE:  For the record, Your Honor, Federal

17  Rule 408 encourages parties to try to settle cases.  It is

18  meant to do so in a way that allows them to speak freely and

19  openly.  If they are going to be constrained by the fact that

20  they have to worry about that being used as weapons against

21  them in other litigations, that will have a chilling effect

22  on the whole purpose of 408.  There is case law to support

23  that.

24              THE COURT:  There is case law to support that in

25  the context of a trial on the merits of an underlying

41
Didier - direct

1    dispute, such as whether there was patent infringement in

2    this case.  For the purposes of this hearing today, I think

3    it does not lend itself to an inclusion under 408 of the

4    answer to the question that has been propounded.  So I am

5    going to overrule the objection.

6              MR. ANDRE:  Thank you, Your Honor.

7    BY MR. WARE:

8    Q.    In any event, the terms under which you were prepared

9    to settle with the litigants was on the basis of their

10   agreeing not to collect cord blood.  Isn't that correct?

11   A.    Not to collect cord blood for unlicensed cord blood

12   banks.

13   Q.    Yes.  In other words, you were intent at this point on

14   shifting this business, if you could, to the licensed cord

15   blood banks.  Correct?

16   A.    I would not say shifting the business.  All we wanted

17   to do is to enforce our patents and come to an agreement with

18   the obstetricians not to collect for any unlicensed banks and

19   participate in the infringement act.

20   Q.    Well, without my trying to characterize your conduct,

21   the effect of the settlement agreement, as you understood it,

22   was that any of these litigants who agreed, these physicians

23   who agreed to the settlement would be promising to collect

24   cord blood only for your licensees.  Correct?

25   A.    That is correct.

42
Didier - direct

1   Q.    And if they did otherwise, they would be in breach of

2   the agreement.  Correct?

3   A.    That is correct.

4   Q.    And you understood and hoped, in fact, that that would

5   cut down the supply of blood to the four companies which you

6   viewed as renegade in this industry, that is the unlicensed

7   banks.  Correct?

8   A.    We hoped, and that was the purpose of it, that it would

9   stop infringing acts, yes.

10  Q.    In the August 20th letter, going back to 5 for a

11  moment, in the fourth paragraph down, you say in part, quote,

12  It is PharmaStem's position, as asserted in the recent

13  lawsuits, that obstetricians are liable for patent

14  infringement if they collect cord blood..."

15        Is that correct?

16  A.    That is correct.

17  Q.    So one of the things you were telling the physicians

18  was that it's an infringing act to collect cord blood.

19  Right?

20  A.    Yes.

21  Q.    Now, you understood following Judge Sleet's July 2nd

22  order that that was exactly the kind of misleading statement

23  that the Court had told you not to make.  Isn't that so?

24  A.    No.

25  Q.    Didn't you understand Judge Sleet's order of July 2 to

62
Didier - direct

1    A.    Yeah.    That is correct.    Our counsel asked us to remove

2    it.

3    Q.    Let me ask you a couple of questions about an entity

4    called Stembanc.    Do you know Stembanc?

5    A.    Yes.

6    Q.    What is the relationship between Stembanc and your

7    company, PharmaStem?

8    A.    Stembanc is a licensee of PharmaStem.

9    Q.    Is a licensee of PharmaStem?

10   A.    Sorry.    It is one of our licensees.

11   Q.    Do you own any interest in Stembanc?

12   A.    Yes.

13   Q.    What is that ownership interest?

14   A.    It's a minority interest of 15 percent.

15   Q.    Let me direct you to Exhibit 18A.    What percentage

16   ownership do you have in Stembanc?    You meaning PharmaStem.

17   A.    I repeat, 15 percent.

18   Q.    Can that ownership interest escalate pursuant to any

19   agreement you have with Stembanc?

20   A.    I think it could under certain circumstances.    But it

21   has been about two years.    So I don't know the details at

22   this present time.

23   Q.    What is the maximum ownership interest that PharmaStem

24   can achieve in Stembanc?

25   A.    It may be about 35 or 40.    But don't hold me to that,

63

Didier - direct

1    because I haven't looked at that agreement in a long time.

2    Q.    Are you aware of this release of August 2nd from

3    Stembanc?

4    A.    I am not aware.

5    Q.    Do you see in the third paragraph, third line, they say

6    here in part, quote, "Obstetricians are now refusing to

7    collect the cord blood for the infringing companies"?

8              Do you see that language, quote,"...even in cases

9    in which parents have already paid"?

10   A.    Yes.

11   Q.    That's consistent with your understanding as of at

12   least early August 2004, is it not?

13   A.    I don't understand the question.

14   Q.    You knew, not just based on Stembanc's experience, but

15   from other information from these physicians, that your

16   campaign, writing letters to physicians, seeking amnesty

17   agreements, was having an effect in the marketplace.

18   Correct?

19   A.    I think that there were obstetricians, there are

20   obstetricians who refrained from continuing infringement of

21   PharmaStem's patents, that's correct.

22   Q.    Putting that another way, collections on behalf of

23   licensed companies increased significantly, did they not,

24   following your mailing?

25   A.    I don't know.

251

1          MR. ENGLANDER:  Your Honor, two things we need

2     that were referenced.  In addition, the client wanted us to

3     point out to the Court, with respect to the last motion, the

4     mere pendency of that motion is being used in the marketplace

5     against our client right now.  So we wanted to point that

6     out.  The client wants to emphasize that there is urgency

7     just getting the motion decided.

8          THE COURT:  There are a lot of urgent matters

9     before the Court.

10          Okay.  Thank you.

11          (Hearing concluded at 5:30 p.m.)

12               - - -

13    Reporter:  Kevin Maurer

14

15

16

17

18

19

20

21

22

23

24

25