# EXHIBIT A

DECLARATION OF CHANG H. KIM IN SUPPORT OF CBR'S REPLY TO PHARMASTEM THERAPEUTICS, INC.'S AND NICOLAS DIDIER'S OPPOSITION TO MOTION TO STAY PROCEEDINGS PENDING RESOLUTION OF THE MULTIDISTRICT LITIGATION MOTION TO TRANSFER FOR CONSOLIDATION AND COORDINATION OF PRETRIAL PROCEEDINGS IN A SINGLE FORUM

**BEFORE THE JUDICIAL PANEL
ON MULTIDISTRICT LITIGATION**

In re: PharmaStem Therapeutics, Inc. Patent Litigation

MDL Docket No. 1660

## MOVANTS' REPLY IN SUPPORT OF MOTION TO TRANSFER

Cryo-Cell International, Inc., CorCell, Inc., ViaCell, Inc. and CBR Systems, Inc. and 15 other individuals or entities[1] ("Movants") submit this Reply pursuant to Rule 7.2 (d) of the JPML Rules in support of the Motion to have the Panel take jurisdiction over seven actions presenting claims related to a series of patents held by PharmaStem Therapeutics, Inc. ("PharmaStem") and to transfer five of them to the United States District Court for the District of Delaware (Hon. Gregory M. Sleet) for consolidation and coordination of pretrial proceedings in a single forum together with the two cases already pending before Judge Sleet.

Responses to the Motion have been filed (1) by PharmaStem Therapeutics, Inc. and Nicholas Didier, opposing transfer or, in the alternative, urging consolidation of five cases only in the Northern District of California, and (2) by Stembanc, Inc. and Archibald A. Grabinski

---

[1] The four corporations listed are joined in this motion by the following entities, each of which has been named as a defendant in an action for patent infringement brought by PharmaStem Therapeutics, Inc. ("PharmaStem"): Bruce Zafran, M.D., Molly McBride, M.D., Carlo M. Croce, M.D., Sutter Health Obstetrical and Gynecological Associates, P.A., FemPartners, Inc., and Caritas St. Elizabeth's Medical Center of Boston, Inc., Monica Aszlerbaum,

urging separation of the claims against Stembanc and Grabinski from any coordination and requesting their transfer to the Northern District of Ohio or, in the alternative, to California.

PharmaStem's Opposition fails to accurately reflect the procedural posture of the litigation, or the extent of the commonality of the seven actions at issue. Once again, these are the basic facts, which cannot be <u>reasonably</u> disputed:

1. There are four PharmaStem patents at issue, the '681, '553, '645, and '427 patents. Those 4 patents share essentially the same specification, and substantially the same claims. The '681 and '553 patents have already been construed by Judge Sleet, and tried before Judge Sleet. The '645 patent, which is asserted in PharmaStem's most recent lawsuits, has the identical specification as the '681, and nearly identical claims. The '427 patent, also asserted in the most recent lawsuits, has the identical specification as the '553, and virtually identical claims.[2]

2. <u>All</u> the 7 lawsuits involve at least two of these PharmaStem patents. The 2004 Delaware. Antitrust suit claims patent misuse of, at least '645 and '427 patents. It is thus false for PharmStem to claim that that suit "does not have any patents before it whatsoever." PharmaStem Memo at 11.

3. All of the 5 patent suits recently-filed by PharmaStem involve exactly the same patents, the '645 and '427. These cases are all in their <u>very</u> early stages, and thus consolidation is particularly appropriate. There is no reason these patents should be pursued, or construed, in 5 different federal courts.

---

Andrew Cassidenti, Eunice U. Lee, Carla Wells, Anita York, Bruce A. Hagadorn, Rahasree T. Seshadri and Arthur Goldstein.

[2] Compare claim 13 of the '553 patent with claim 19 of the '427 patent:

13.    A method for hematopoietic or immune reconstitution of a human comprising:
(a) isolating human neonatal or fetal blood components containing hematopoietic stem cells;
(b) cryopreserving the blood components;
(c) thawing the blood components; and
(d) introducing the blood components into a suitable human host,
such that the hematopoietic stem cells are viable and can proliferate within the host.

19.    A method for treating a human patient in need of hematopoietic reconstitution comprising:
(a) obtaining human neonatal or fetal blood components comprising hematopoietic stem cells derived from the umbilical cord or placental blood of a human collected at birth of said human;
(b) cryopreserving the blood components;
(c) thawing the blood components; and
(d) introducing the blood components into the human patient so as to provide hematopoietic reconstitution

4. Delaware was PharmaStem's original forum of choice to pursue its patent claims against CryoCell, CoreCell, Via Cell, and CBR. At that time it plainly had no concerns about the convenience of a Delaware forum to it, or to defendants. It also had no concerns about the Delaware forum's experience with, or ability to manage, a patent case.

5. Judge Sleet is "intimately familiar" with patents, and the patent claim. He has actively managed the initial case, *PharmaStem Therapeutics, Inc. v. ViaCell, Inc., et al.*, No. 02-148-GMS and brought it through trial on all issues in less than 20 months. He ruled on all the parties post-trial motions on September 15, 2004. When additional motions were filed after his September 15 Order, Judge Sleet continued to actively manage this matter, and he has since held 3 hearings, including a full day evidentiary hearing on November 3. It is simply disingenuous for PharmaStem to refer to "pending post-trial motions" as if Judge Sleet has been dilatory in deciding them; briefing was not complete on any of the pending motions until the last week of October.

Defendants' request is thus straightforward; consolidate this multiplicity of proceedings, all of which undeniably involve the same core of operative facts and law, for pretrial purposes before the federal judge who already has considerable experience and familiarity with those issues. Such coordination is surely in the interest of judicial efficiency, and is far more efficient and cost effective for the parties. Despite its haphazard charges and assertions, PharmaStem fundamentally cannot explain why its multiple suits should proceed severally, and independently.

Finally, it seems entirely inappropriate that this case be consolidated before a Judge other than Judge Sleet, simply because PharmaStem is disappointed with the results it has received to date. Judge Sleet's hard-earned experience with the patents and issues here is strong reason <u>for</u> consolidation, not against it. Although actual results have been mixed to both sides, such disappointment cannot get in the way of the obvious efficiencies from consolidating before Judge Sleet.

I.   **ALL SEVEN ACTIONS SHOULD BE COORDINATED**

Each of the seven lawsuits at issue is part of a unitary dispute, i.e., PharmaStem's effort to coerce the private umbilical cord blood banking companies that have not licensed its patents to accept PharmaStem's licensing terms. PharmaStem has pursued this goal not only by bringing suits against alleged infringers of its patents, but also by threatening infringement liability against health care providers on the basis of conduct that cannot in good faith be asserted to infringe any of PharmaStem's patents. The latter conduct has given rise to claims that are pending in five of the seven actions at issue.[3]

A.   **The Cases Involve a Common Set of Issues, Arising From the Patents and PharmaStem's Conduct in Threatening Enforcement.**

1.   **PharmaStem Has Admitted That the Patents Involve "Essentially the Same Invention."**

PharmaStem argues that there is only a "superficial appearance of similarity of issues" PharmaStem Memo at 2. While it asserts that there are "significantly different facts, witnesses, discovery and even theories of infringement" among the various cases, PharmaStem does not explain how the cases truly differ. In fact, an examination of the patents at issue in the various cases shows the very close overlap among them. See Chart of PharmaStem's Patents, Exhibit 21 at November 3, 2004 hearing before Judge Sleet in the two Delaware actions, attached hereto as Exhibit A. The boilerplate allegations of infringement are virtually identical in each of the five cases filed this year by PharmaStem. Exhibits G, I, K, M and O to Rodgers Affidavit, filed in support of the Motion.

---

[3] The exceptions are the Massachusetts action, in which no answer or counterclaim has yet been filed by ViaCell, and the Central District of California case, in which only physicians remain as defendants.

PharmaStem argues that there are "insufficient common facts" to support consolidation for pretrial proceedings, stating that the '645 patent and the '427 patent each cover "different aspects" of the process of cord blood banking and treatment using cord blood stem cells. However, "Section 1407 does not require a complete identity or even a majority of common factual issues as a predicate to transfer." *Cygnus Telecommunications Technology LLC Patent Litigation*, 177 F. Supp. 2d 1375, 1376 (J.P.M.L. 2001). Putting aside the obvious fact that the '645 patent is a claim to a composition of matter while the '427 patent contains method claims, it is true that both of these patents are asserted in all five of the suits filed by PharmaStem in July and August, 2004. The '645 and '427 patents are closely analogous, with virtually identical specifications, to both the '681 and '553 patents that are the subject of the 2002 Delaware action, and contain very similar claims to those patents. See Exhibits A – D to Rodgers Affidavit.[4]

---

[4] By way of example, claim 1 of the '681 patent reads:

> 1. A cryopreserved therapeutic composition comprising:
> viable human neonatal or fetal stem cells derived from the umbilical cord blood or placental blood of a single human collected at the birth of said human, in which said cells are present in an amount sufficient to effect hematopoietic reconstitution of a human adult; and an amount of cryopreservative sufficient for cryopreservation of said cells.

Claim 1 of the '645 patent reads almost identically:

> 1. A cryopreserved pharmaceutical composition comprising:
>
> (a) viable human neonatal or fetal stem cells derived from the umbilical cord blood or placental blood of a single human collected at the birth of said human, in which said cells are present in an amount sufficient to effect hematopoietic reconstitution of a human adult;
>
> (b) an amount of cryopreservative sufficient for cryopreservation of said cells; and
>
> (c) a pharmaceutically acceptable carrier.

Claim 49 of the '427 patent in effect claims a method for making a composition such as that claimed in the '681 and '645 patents:

> 1. A method for storing human neonatal or fetal hematopoietic stem cells derived from the blood, said method comprising cryopreserving human neonatal or fetal blood components containing human neonatal or fetal hematopoietic stem cells from the umbilical cord blood or placental blood of a single human collected at the birth of said human, such that the cells remain viable, in which

564399_1                                          5

Finally, all four of those patents, together with the '275 patent, are the subject of PharmaStem's licensing program, and of PharmaStem's efforts to induce physicians to refuse to collect cord blood for their patients who are customers of ViaCell, Cryo-Cell, CorCell or CBR. Only the desire to escape the jurisdiction of Judge Sleet induced PharmaStem to leave the '681 and '553 patents out of the "amnesty agreements" which it has sought to execute with physicians to secure their agreement to restrict collection of cord blood. See Transcript of Hearing, November 3, 2004 in No. 02-148-GMS (D. Del.) at 49. Excerpts from this transcript are attached as Exhibit B hereto. PharmaStem does not point out how the patents it asserts in the 2004 suits cover "different aspects of this process" than the '681 and '553 patents.[5] In fact, the four patents cover virtually identical subject matter. *Id.* at 193.

PharmaStem took a very different position in August, 2003 in the 2002 Delaware case. PharmaStem opposed a motion *in limine* to preclude references at trial to the prosecution of the '645 and '427 patents, which issued after the commencement of that litigation, arguing that "[t]he Related Patents [the '645 and '427], derived from the same patent application as the Patents-In-Suit [the '681 and '553], claim essentially the same invention as the Patents-In-Suit, which is confirmed by the fact that the Related Patents are subject to a terminal disclaimer tying them to the Patents-In-Suit." PharmaStem Therapeutics, Inc.'s Opposition to Defendants' Motion *in Limine* to Exclude Evidence Regarding Prosecution of Related Patents (MIL #9) at 1, a copy of which is attached hereto as Exhibit C. In particular, as PharmaStem described it, "[t]he Related Patents also involve substantially the same invention, the same specification, very

---

said cells are present in an amount sufficient to effect hematopoietic reconstitution of a human adult.

[5] To the extent that PharmaStem's characterization of "three steps" suggests that any of the claims of any of the patents are infringed by the collection of cord blood by an obstetrician, it is plainly wrong. PharmaStem Memo at 9.

similar claim language as the Patents-In-Suit, the same inventors and the same examiner." *Id.* at 1-2.

PharmaStem makes the remarkable statement that "Whereas the 2002 Delaware Action only involved infringement by cord blood banks, the 2004 Provider Actions largely concern infringement by obstetricians." PharmaStem Memo at 10. This is interesting because while each of the 2004 Provider Actions asserts both the '645 and '427 patents against the defendant cord blood banks, only the '427 patent is asserted against the obstetricians (or other healthcare providers). The fact that there is no overlap among the defendants named in the 2004 Provider actions is unremarkable, since PharmaStem intentionally set it up that way. The imperfect overlap in the identity of the parties on the counterclaims filed by CBR, CorCell and Cryo-Cell, and the defendants named in the 2004 Delaware action is no bar to the coordination of the cases. There is no requirement that the parties be perfectly aligned.

### 2. The Claims of the Cord Blood Banks Are Integrally Related to PharmaStem's Infringement Claims.

The conduct of PharmaStem (and its Chief Executive Officer, Mr. Didier) since June 2004 in allegedly threatening enforcement of PharmaStem's patents, plainly beyond the scope of those patents, is currently at issue in every one of the subject cases except the Massachusetts[6] and Central California litigations (even though Didier is not a party to the Florida or Delaware cases.) Similarly, the conduct of Stembanc, a licensee of PharmaStem in which it holds a 15% ownership interest[7], and its CEO, Mr. Grabinski, in making allegedly false and misleading statements directed to the same end as PharmaStem's campaign of threats, baselessly suggesting infringement liability of physicians, is at issue in one of the California cases and the

---

[6] ViaCell has not yet answered the Massachusetts complaint.
[7] See Transcript of November 3, 2004 hearing at 62 – 63, Exhibit B hereto.

Pennsylvania case (though Grabinski is not a party to the Pennsylvania case).[8] The asserted harm to the cord blood banks from this conduct is of the same character in each case.

PharmaStem blatantly misrepresents the position taken by the Movants with respect to the relevance of the patents to the 2004 Delaware action. In that action, ViaCell, Cryo-Cell and CorCell charge that PharmaStem's conduct in coercing physicians to agree to refuse to collect cord blood for patients who are customers of those cord blood banks, constitutes misuse of its patents, an antitrust violation, as well as unfair competition and tortious conduct under state and federal law. These claims (with the exception of the antitrust claim) are essentially similar to those advanced by Cryo-Cell, CorCell and CBR in the cases in which PharmaStem has sued them for infringement. PharmaStem states that at the November 3, 2004 hearing before Judge Sleet, the plaintiffs in the Delaware case represented that whether or not PharmaStem proves infringement of its patents is irrelevant to the antitrust case. Exhibit 1 to Andre Affidavit at 136. ViaCell's counsel stated that the *possibility* that some physician might have actively induced infringement of a PharmaStem patent is irrelevant to the fact that PharmaStem was improperly threatening infringement liability against *every* physician who merely collects cord blood.

A determination of the scope of PharmaStem's patents, *i.e.*, the determination that the mere collection of cord blood cannot infringe, is integral to the resolution of the antitrust claims in the 2004 Delaware case, and to the tort claims in that case, as well as the tort claims in the Florida, Pennsylvania and Northern California cases. PharmaStem's counsel effectively

---

[8] While there are some differences between the allegations brought by the cord blood banks against PharmaStem and Didier, on the one hand, and the allegations against Stembanc and Grabinski, on the other, a key element of both sets of claims is a pattern of false and misleading statements directed to the medical community and to consumers regarding the law of patent infringement and the course of the first Delaware litigation that, the banks allege, had the purpose and effect of causing physicians and patients to cease dealings with the cord blood banks or their customers. The claims against Stembanc and Grabinski should be transferred to Delaware. The devices of early remand and transfer are available to the transferee court to remedy any serious inconvenience that may result to those parties. *In re Silicone Gel Breast Implants Products Liability Litigation*, 793 F. Supp. 1098, 1100 (J.P.M.L. 1992)(objecting parties transferred, subject to curative remedies of remand and transfer).

conceded this at the November 3, 2004 hearing before Judge Sleet: "You would have to determine the scope of the patents and determine the activity that we say is infringing." Transcript at 191 (Exhibit B hereto). PharmaStem has filed a motion to dismiss the 2004 Delaware action on the ground that the claims asserted there are "all within the same subject matter" as the actions it has filed in the various other jurisdictions, arguing that the cord blood banks' claims are compulsory counterclaims which must be maintained in those actions. *Id.* at 186.

### B. Failure to Coordinate the Actions Would Allow a Risk of Inconsistent Adjudications and Discovery Management.

Motions to dismiss the antitrust and tort claims have been filed by PharmaStem, Didier, Stembanc and Grabinski. Absent consolidation, there is a risk of inconsistent rulings among the four district courts presently facing such motions, which raise substantially identical legal theories based on the same pattern of facts. *See in re Computervision Corp. Sec. Litig.*, 814 F. Supp. 85, 86 (J.P.M.L. 1993)(centralization under § 1407 "necessary in order to eliminate duplicative discovery, prevent inconsistent pretrial rulings...and conserve the resources of the parties, their counsel and the judiciary.")

PharmaStem attempts to explain away the mischief inherent in parallel proceedings relating to the same patents by stating "adjudication of claim construction issues (or other patent issues) in any one of the District Courts in the 2004 Provider Actions will be dispositive of the same issues in the other District Courts in the 2004 Provider Actions via the doctrine of collateral estoppel. Thus, transfer for consolidation and coordination of all pretrial proceedings in a single forum is unnecessary to resolve issues of claim construction or other patent issues." PharmaStem Memo at 12. This statement is flatly wrong, for a number of reasons. First, a claim construction or other interlocutory determination is not binding under the principle of issue

preclusion. *See Graco Children's Prods., Inc. v. Regalo Int'l.*, 77 F. Supp. 2d 660 (E.D. Pa. 1999)(prior claim construction in settled case, with no opportunity for appellate review, not binding on plaintiff). More importantly, a claim construction determination involving one defendant will not estop a defendant in another case from advocating for a different construction. *See Texas Instruments, Inc. v. Linear Technologies Corp.*, 182 F. Supp. 2d 580 (E.D. Tex. 2002)(neither collateral estoppel nor *stare decisis* precludes a new defendant from seeking a new claim construction). Invariably, such parallel proceedings will consume an inordinate amount of duplicative effort by the parties and the courts involved, not only in motion practice, but in the management of discovery by six different district courts.

C.   **Both Delaware Cases Should Be Included in the Consolidation.**

PharmaStem argues that the 2002 Delaware action should not be included in any consolidation because it is in a significantly different stage, *i.e.*, there has already been a trial, citing *In re Deering Milliken Patent Litigation*, 476 F. Supp. 461 (J.P.M.L. 1979). *Deering* was a much different case, where a single, later-filed action was proposed to be coordinated with a prior action that had already been resolved on appeal by the Fourth Circuit, and only a *certiorari* petition remained. Here, further proceedings remain open in the district court in the 2002 Delaware action, including contempt proceedings arising from the same pattern of conduct that is the subject of counterclaims filed in four of the pending infringement actions, as well as in the 2004 Delaware action, as well as the possibility of a retrial on part of the case on remand after a decision by the Federal Circuit. Similarly, while PharmaStem states that the 2004 Delaware action should not be coordinated because it does not involve any patents, this argument is also wrong: the allegations of the 2004 Delaware action are based on patent misuse – they involve

PharmaStem's conduct in making allegedly baseless threats of infringement of the very patents that are the subject of the other pending cases.

## II. DELAWARE IS THE MOST APPROPRIATE TRANSFEREE FORUM

### A. PharmaStem Has Misrepresented the Relative Convenience of Delaware and its Preferred Forum, the Northern District of California.

PharmaStem argues that the Northern District of California, the home court of its lead counsel, is a more appropriate transferee district than the District of Delaware. The initial premise of this argument is the misstatement that the action in the Northern District of California is the farthest along of all the cases, noting that a hearing on motions to dismiss the counterclaims and the initial case management conference are scheduled for January 7, 2005.[9] To the contrary, motions to dismiss counterclaims are already fully briefed in the Eastern District of Pennsylvania and the Middle District of Florida, and the initial case management conference has already been held in the Middle District of Florida. Judge James Moody of that court determined *sua sponte* to stay all proceedings in that case for 120 days to permit the Panel to consider the instant motion. Judge Moody expressed the view that a single judge should construe the patents at issue. Exhibit E hereto. PharmaStem unsuccessfully sought temporary restraining orders in the Middle District of Florida and the District of Massachusetts to preclude Cryo-Cell and ViaCell, respectively, from proceeding with the November 3, 2004 injunction hearing in the 2004 Delaware action.

PharmaStem argues that transfer to Delaware would work against the convenience of the parties "because each of the parties to the 2004 Provider Actions is located in the district where

---

[9] A motion to stay proceedings pending the Panel's action has been filed by CBR in the Northern District of California case and is also scheduled for hearing on January 7, 2005. A similar motion has been filed by CorCell in the Eastern District of Pennsylvania case.

564399_1                                          11

each case has been brought." PharmaStem Memo at 8. This is simply not true. For example, Dr. Molly McBride is not a resident of Pennsylvania, where she was sued, but is a resident of Delaware, where she practices medicine.[10] Dr. Bruce Zafran is not a resident of the Middle District of Florida, where he was sued, but of the Southern District. FemPartners, Inc., sued in the District of Massachusetts, is a Delaware corporation that has its principal place of business in Texas, as does Obstetrical and Gynecological Associates, P.A., its co-defendant in Massachusetts.

PharmaStem's numeric analysis of convenience is unconvincing. All of the California-based parties have joined in the motion to transfer the cases to Delaware for pretrial proceedings. California would be a significantly *inconvenient* venue for ViaCell, Cryo-Cell and CorCell and their party-witnesses, as well as defendants McBride, Croce, Zafran and Caritas St. Elizabeth's, all located on the East Coast. Delaware is far more convenient for those parties. PharmaStem itself is based a short train ride away from Wilmington.

**B.      Judge Sleet is in the Best Position to Manage this Litigation.**

PharmaStem touts the merits of the Northern District of California as a venue for the efficient management of patent litigation. This is undoubtedly true; but the District of Delaware also has significant expertise and experience in dealing with complex patent litigation. And the specific experience of the trial judge assigned to the two Delaware cases is a resource that should not be lightly cast aside. The docket management statistics quoted by PharmaStem show a difference of approximately *two weeks* in the median time to disposition between the Northern District of California and the District of Delaware. If the litigation were transferred to Judge White in California, certainly he and Judge Sleet would spend more time than that in getting

---

[10] Dr. McBride has filed a motion to dismiss her from the Pennsylvania action on the basis of lack of subject matter jurisdiction. A copy of her declaration in that case is attached hereto as Exhibit F.

564399_1                                                 12

Judge White "up to speed." The fact that Judge Sleet has become familiar with these patents and the parties over a period of more than two years clearly outweighs any minimal difference in median docket management statistics.

PharmaStem makes the astounding argument that Judge Sleet's familiarity with the issues in the litigation is a factor *against* transfer of the related cases to him for pretrial proceedings. PharmaStem complains of two rulings by Judge Sleet in the 2002 Delaware action as creating in the minds of PharmaStem and Didier a "perception of unfairness" on the part of the court. These are (1) the July 2, 2004 injunction finding that PharmaStem had made false and misleading statements concerning the law of infringement and the rulings of the court and (2) the September 15, 2004 ruling on post-trial motions which vacated the jury verdicts of infringement of the '681 and '553 patents, but upheld the findings of validity of the patents. As to the first of these actions, although PharmaStem complains of the entry of an injunction without a full opportunity for briefing, it fails to note that the court did entertain briefs from the parties during the month of July, and has elected not to disturb the injunction. PharmaStem likewise chose not to appeal it and in fact, has never offered anything but excuses for what were patently false statements regarding the prior rulings of the Court. As to the September 15 decision, PharmaStem raises no argument of procedural irregularity or other basis to perceive unfairness. It simply wishes to avoid a court that it anticipates may issue unfavorable rulings on the merits in the future.[11]

---

[11] PharmaStem cites *In re Silicone Gel Breast Implants Products Liability Litigation*, 793 F. Supp. 1098, 1101 (J.P.M.L. 1992) as supporting transfer to a different court where a litigant perceives unfairness on the part of the suggested forum. However, in *Silicone Gel*, the Panel was concerned about the perceptions of hundreds, if not thousands of unsophisticated individual claimants in an atmosphere of bitter contention among the plaintiffs' bar and defendants over how the potentially massive litigation should be managed, where opposing camps attacked the others' preferred forum districts with unusual vehemence. The matter was resolved by sending the litigation to Chief Judge Pointer, a former chairman of the Panel, in a district advocated by none of the parties. *Silicone Gel* establishes no broad principle that a proposed forum should be rejected whenever a litigant perceives an unfairness for whatever reason, and is thus inapposite here.

On the other hand, the moving parties have selected Delaware as their preferred forum not because of any perception of favoritism from Judge Sleet, but because his experience with the patents and the parties will clearly promote a more just, speedy and inexpensive resolution of the overall dispute.

PharmaStem suggests that Judge Sleet has been dilatory, or simply overworked, in failing to deal with issues that remain outstanding as a result of his ruling on post-trial motions in the 2002 Delaware action. However, PharmaStem's protestations that a transfer of the cases to Delaware will risk a delay in the resolution of the first Delaware action ring hollow. First of all, Judge Sleet has determined to give priority to the resolution of the open issues with respect to that case, as demonstrated in the transcript of the November 15 telephonic conference, at 4-6, 11-12, a copy of which is attached to the Andre Affidavit as Exhibit 2. Those open matters, all arising out of the trial court's September 15, 2004 Memorandum and Order, include defendants' motion for partial reconsideration of the ruling on post-trial motions to the extent that the court denied defendants' motion for judgment as a matter of law on infringement of the '681 patent, PharmaStem's motion for a preliminary injunction pending a retrial of the infringement issues on the '681 patent and the parties various motions for certification for immediate appeal of issues arising from the first trial. *Id.*

There is no basis for speculating that transferring to Delaware the cases filed elsewhere will delay the ultimate resolution of the matters at issue in the first trial. It must also be noted that PharmaStem waited more than eight months following its apparent success in the first trial to assert claims of infringement of the '645 and '427 patents. Indeed, because of terminal disclaimers, those patents have the same limits on their time to expiration as the '681 and '553 patents, respectively. See Exhibits A and C hereto.

PharmaStem would make much of Judge Sleet's reference to the utilization of his court's "limited resources" to focus on those issues having the greatest immediacy. It is a truism that every district court has limited resources. The issue before the Panel is how those resources may be best utilized to achieve the goals of §1407. Judge Sleet has been actively engaged in the management of these cases, including a full-day hearing on pending motions on November 3, 2004 and three telephonic conferences, all since his September 15th ruling on post-trial motions. The matters now pending before him have only recently been briefed.

C. **PharmaStem's "Forum Shopping" Should not be Rewarded, at the Expense of Fairness and Efficiency.**

As Judge Sleet noted at the November 3 hearing, it was PharmaStem that elected to complicate the process of litigation of its patents by filing a second wave of suits in far-flung jurisdictions, when it could well have raised all of its issues in Delaware, before a court that had already devoted significant resources to understanding the technology and the issues presented by these patents. See November 3 hearing transcript at 187-189 (Exhibit B hereto). While PharmaStem protests that it could not obtain personal jurisdiction in Delaware over all of the provider defendants it elected to sue, it is also clearly true that if PharmaStem wished to put to the test its theories of obstetrician liability under its patents, it could have done so by focusing on defendants who were subject to suit in Delaware. It is not apparent why selecting Delaware-resident physicians from among the list of 25,000 who were sent letters communicating threats of infringement liability would not have served that purpose. *Id.* Indeed, as noted above, two of the provider-defendants sued elsewhere (McBride and FemPartners) are subject to jurisdiction in Delaware.

PharmaStem's "forum shopping" charges have been largely rejected already by several district courts. The only "forum shopping" here is PharmaStem's admitted effort to escape from

Judge Sleet. PharmaStem Memo at 4, 17. In PharmaStem's view, this is presumably good "forum shopping" as opposed to defendants' bad "forum shopping." However, PharmaStem, having initially chosen Delaware as the appropriate venue for litigating its patent disputes with the cord blood banks, now dissatisfied with the Delaware court's rulings (which, by the way, upheld the validity of the '681 and '553 patents), has chosen to create a fragmented pattern of geographically dispersed suits, presumably in search of what it perceives as a more hospitable forum. This unnecessary multiplicity of suits is precisely the kind of problem that §1407 was designed to remedy. Coordination of the cases before Judge Sleet will afford all the parties, and the courts, an opportunity to litigate these matters efficiently, expeditiously and justly.

## CONCLUSION

The Panel should consolidate all seven of the actions that concern PharmaStem's patents for pretrial proceedings before Judge Sleet in the District of Delaware.

Dated: November 30, 2004

Respectfully submitted,

*[signature]*

James J. Rodgers, Esq.
DILWORTH PAXSON LLP
3200 Mellon Bank Center
1735 Market Street
Philadelphia, PA 19103
215-575-7143
Attorneys for Cryo-Cell International, Inc.
CorCell, Inc., Bruce Zafran, M.D., Molly
McBride, M.D. and Carlo M. Croce, M.D.

Paul F. Ware, P.C.
Goodwin Procter LLP
Exchange Place
Boston, MA 02109
617-570-1000
Attorneys for ViaCell, Inc., Obstetrical and Gynecological Associates, P.A., FemPartners, Inc., and Caritas St. Elizabeth's Medical Center of Boston, Inc.

William F. Abrams, Esq.
Pillsbury Winthrop LLP
2475 Hanover Street
Palo Alto, CA 94304-1114
650-233-4668
Attorneys for CBR Systems, Inc., Sutter Health, Monica Aszterbaum, M.D., Andrew Cassidenti, M.D., Eunice U. Lee, M.D., Carla Wells, M.D., Anita York, M.D., Bruce A. Hagadorn, M.D., Rafasree T. Seshadri, M.D., and Arthur Goldstein, M.D.