PAUL J. ANDRE, Bar No. 196585
LISA KOBIALKA, Bar No. 191404
AMANDA M. FOX, Bar No. 212939
PERKINS COIE LLP
101 Jefferson Drive
Menlo Park, CA  94025-1114
Ph: (650) 838-4300
Fx: (650) 838-4350

Attorneys for PharmaStem Therapeutics, Inc.

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
### SAN FRANCISCO

| | |
|---|---|
| PHARMASTEM THERAPEUTICS, INC., a Delaware corporation,<br><br>Plaintiff,<br><br>v.<br><br>CORD BLOOD REGISTRY, INC., dba CBR, a California corporation, and SUTTER HEALTH, INC., a California corporation.<br><br>Defendants. | CASE NO. 04-3072 JSW<br><br>**PLAINTIFF PHARMASTEM THERAPEUTICS, INC.'S NOTICE OF MOTION AND MOTION FOR A PRELIMINARY INJUNCTION AGAINST DEFENDANT CBR SYSTEMS, INC.'S INFRINGEMENT OF THE PATENTS-IN-SUIT; MEMORANDUM OF POINTS AND AUTHORITIES; [PROPOSED] ORDER, filed herewith.**<br><br>**Date/Time:  April 22, 2005/9:00 AM**<br>**Courtroom:  2**<br>**Judge:  Hon. Jeffrey S. White** |
| CBR SYSTEMS, INC., dba CBR a California corporation<br><br>Counterclaimant<br><br>v.<br><br>PHARMASTEM THERAPEUTICS, INC., a Delaware corporation; STEMBANC, INC., a Ohio corporation; NICHOLAS DIDIER; and ARCHIBALD A. GRABINSKI<br><br>Counterdefendants. | |

PHARMASTEM'S MOTION FOR A PRELIMINARY
INJUNCTION AGAINST CBR
CASE NO. 04-3072 JSW

40923-0005/BY043560.059]

I.   ISSUES TO BE DECIDED.................................................................1

II.  SUMMARY OF ARGUMENT.............................................................1

III. STATEMENT OF RELEVANT FACTS ................................................2

IV.  ARGUMENT ...............................................................................3

     A.   PHARMASTEM IS ENTITLED TO PRELIMINARY
          INJUNCTIVE RELIEF AGAINST CBR'S INFRINGEMENT OF
          THE PATENTS-IN-SUIT. ...........................................................3

     B.   THERE IS A REASONABLE LIKELIHOOD OF SUCCESS ON
          THE MERITS OF PHARMASTEM'S PATENT INFRINGEMENT
          CLAIMS AGAINST CBR...........................................................4

          1.   CBR's Cord Blood Banking Activities Infringe the Patents-
               In-Suit...........................................................................4

               a.   PharmaStem's Proposed Claim Construction. ..........................5

               b.   CBR's Cord Blood Units ("CBUs") Meet Every
                    Limitation  of Claim 17 of the'645 Patent. ..............................9

                    (i)    CBR's CBUs are pharmaceutical
                           compositions comprising "viable human
                           neonatal or fetal hematopoietic stem cells
                           derived from the umbilical cord or placental
                           blood of a single human collected at the birth
                           of said human, which have been
                           cryopreserved."..............................................9

                    (ii)   CBR's CBUs comprise hematopoietic stem
                           cells "in an amount sufficient to effect
                           hematopoietic reconstitution of a human
                           adult."......................................................11

                    (iii)  CBR's CBUs also comprise "a
                           pharmaceutically acceptable carrier," thus
                           meeting every limitation of Claim 17 of the
                           '465 Patent. ................................................19

               c.   CBR's CBUs Meet Every Limitation of Claim 46 of
                    the'427 Patent........................................................20

         d.     CBR's CBUs Meet Every Limitation of Claim 49 of the '427 Patent. .................................................................. 21

    2.    The Patents-In-Suit will Reasonably Likely Withstand the Defendants' Challenges to their Validity and Enforceability. ............................................................................ 22

C.    PHARMASTEM WILL SUFFER IRREPARABLE HARM ABSENT A PRELIMINARY INJUNCTION. ................................. 23

D.    THE BALANCE OF HARDSHIPS TIPS IN PHARMASTEM'S FAVOR. ........................................................................................... 25

E.    THE PUBLIC INTEREST FAVORS AN INJUNCTION. ............................. 26

    1.    The Proposed Injunction Presents No Medical Risk to the Public. ................................................................................................ 26

    2.    The Public Interest is Best Served when Pioneering Patents are Upheld. ......................................................................................... 26

    3.    Public Confusion will be Dispelled by Compelling CBR to take Consistent Positions in Litigation and in the Marketplace. .................................................................................... 27

V.    CONCLUSION .............................................................................................. 27

1

2

3

## Cases

*Bell & Howell Document Mgmt. Prod. Co. v. Altek Sys.,*
   132 F.3d 701 (Fed. Cir. 1997)..................................................................23

*Celeritas Techs. Inc. v. Rockwell Int'l Corp.,*
   150 F.3d 1354 (Fed. Cir. 1998)................................................................22

*Compare Transmatic, Inc. v. Gulton Indus., Inc.,*
   53 F.3d 1270 (Fed. Cir. 1995)..................................................................22

*Cybor Corp. v. FAS Techs., Inc.,*
   138 F.3d 1448 (Fed. Cir. 1998)................................................................ 4

*Digital Biometrics Inc. v. Identix, Inc.,*
   149 F.3d 1335 (Fed. Cir. 1998)................................................................ 5

*Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.,*
   535 U.S. 722 (2002) ................................................................................ 8

*H.H. Robertson Co. v. United Steel Deck, Inc.,*
   820 F.2d 384 (Fed. Cir. 1987)................................................................. 4

*Hughes Aircraft Co. v. United States,*
   717 F.2d 1351 (Fed. Cir. 1983)............................................................... 4

*Hybritech, Inc. v. Abbot Labs.,*
   849 F.2d 1446 (Fed. Cir. 1988)............................................................... 3

*Illinois Tool Works, Inc. v. Grip-Pak, Inc.,*
   906 F.2d 679 (Fed. Cir. 1990)................................................................26

*Jack Guttman, Inc. v. Kapykake Enterprises, Inc.,*
   302 F.3d 1352 (Fed. Cir. 2002)...............................................................23

*Markman v. Westview Instruments, Inc.,*
   517 U.S. 370 (1996) ................................................................................ 5

*Markman v. Westview Instruments, Inc.,*
   52 F.3d 967 (Fed. Cir. 1995)................................................................... 4

*Mycogen Plant Science, Inc. v. Monsanto Co.,*
   252 F.3d 1306 (Fed. Cir. 2001)............................................................... 8

*Oakley, Inc. v. Sunglasses Hut Int'l,*
   316 F.3d 1331 (Fed. Cir. 2003)...................................................3, 22

*PPG Indus., Inc. v. Guardian Indus. Corp.,*
   75 F.3d 1558 (Fed. Cir. 1996)...........................................................24

*Richardson v. Suzuki Motor Co., Ltd.,*
   868 F.2d 1226 (Fed. Cir. 1989).........................................................26

*Smith Int'l, Inc. v. Hughes Tool Co.,*
   718 F.2d 1573 (Fed. Cir. 1983).........................................................24

*Smiths Indus. Med. Sys., Inc. v. Vital Signs, Inc.,*
   183 F.3d 1347 (Fed. Cir. 1999).........................................................22

*Tate Access Floors, Inc. v. Interface Architectural Resources, Inc.,*
   279 F.3d 1357 (Fed. Cir. 2002)...........................................................2

*Univ. of Tex. v. Camenisch,*
   451 U.S. 390 (1981)............................................................................4

*Vitronics Corp. v. Conceptronic Inc.,*
   90 F.3d 1576 (Fed. Cir. 1996).............................................................5

*Warner-Jenkinson Co. v. Hilton Davis Chem. Co.,*
   520 U.S. 17 (1997).............................................................................5

*Windsurfing Int'l, Inc. v. AMF, Inc.,*
   782 F.2d 995 (Fed. Cir. 1986)...........................................................25

*WMS Gaming Inc. v. Int'l Game Tech.,*
   184 F.3d 1339 [] (Fed. Cir. 1999).....................................................22

**Statutes**

35 U.S.C. § 271(c).................................................................................21

35 U.S.C. § 282....................................................................................22

35 U.S.C. § 283.................................................................................1, 3

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PLEASE TAKE NOTICE THAT the motion served and filed herewith has been set for hearing on April 22, 2005, at 9:00 AM, or as soon thereafter as may be heard, before the Honorable Jeffrey S. White, in the San Francisco Division of the United States District Court for the Northern District of California.

PharmaStem Therapeutics, Inc. ("PharmaStem") hereby moves the Court to preliminarily enjoin CBR Systems, Inc., dba CBR, ("CBR") from future infringement of Claim 17 of United States Patent No. 6,461,645 B1 ("'645 Patent") and Claims 46 and 49 of United States Patent No. 6,569,427 B1 ("'427 Patent")(collectively, "Patents-In-Suit"), pursuant to 35 U.S.C. § 283.[1]

## I.   ISSUES TO BE DECIDED

Whether PharmaStem is entitled to preliminary injunctive relief against CBR to prevent likely infringement of the Patents-In-Suit.

## II.   SUMMARY OF ARGUMENT

The Patents-In-Suit are generally directed toward medically therapeutic compositions of fetal or neonatal hematopoietic stem and progenitor cells of the blood derived from the umbilical cord or placenta of a newborn at birth ("cord blood"), and methods of isolating and preserving such compositions. *See* '645 Patent and '427 Patent, *passim*. The principal value of cord blood lies in its capacity to reconstitute hematopoietic, or blood and immune, systems damaged by diseases or disorders. *Id.* Until the discovery of the therapeutic utility of cord blood by the inventors, the primary treatment option for a patient requiring hematopoietic stem cell transplantation was bone marrow transplantation. However, with the advent of cord blood transplantation, cord

---

[1] *See* Declaration of Lisa Kobialka ("Kobialka Decl."), Exhs. 1, 2.

blood could be easily preserved for possible future use by the donor, a family member, or sufficiently-matched unrelated patients.

CBR is a private cord blood bank that offers the services of aiding and assisting its clients with the collection of their children's cord blood, and cryopreserving and storing it, for future use by the donors or their family members. Ample evidence is adduced herein, demonstrating that CBR's own statements, practices, and cord blood banking activities— including actual successful transplantations into adults—in addition to the overwhelming scientific evidence, firmly establish that CBR's stored cord blood units more probably than not infringe the Patents-In-Suit. Accordingly, PharmaStem will suffer irreparable harm absent an injunction, the balance of hardships tips in PharmaStem's favor, and the public interest favors an injunction. For these reasons, PharmaStem requests an order preliminarily enjoining CBR from continuing and future infringement of the Patents-In-Suit. *See Tate Access Floors, Inc. v. Interface Architectural Resources, Inc.*, 279 F.3d 1357, 1364-65 (Fed. Cir. 2002).

### III.    STATEMENT OF RELEVANT FACTS

PharmaStem is the owner of a pioneering invention that indisputably changed the world of hematopoietic stem cell transplantation by fundamentally adding to the universe of medical options for the treatment of many diseases and disorders. The inventors discovered that the blood in the umbilical cord and placenta of a newborn contained stem cells that, despite the relatively tiny amount of cord blood available from a single newborn, could be a valuable medical resource for persons in need of hematopoietic stem cell transplants. *See* '645 Patent at col. 11:55 to 12:35; '427 Patent at col. 13:32 to col. 14:11. In September 1988, the inventors directed a clinical trial, collecting, cryopreserving, and providing the cord blood, for the world's first successful cord blood stem cell transplant. *See* '645 Patent at col. 57:1 to col. 58:67; '427 Patent at col. 56:63 to col. 58:7. The pioneering work of the PharmaStem inventors has since been well-

PHARMASTEM'S MOTION FOR A PRELIMINARY
INJUNCTION AGAINST CBR
CASE NO. 04-3072 JSW                              2

publicized and their contribution is now roundly recognized by the scientific and medical communities.[2]

CBR has earned a windfall practicing PharmaStem's invention in total disregard of PharmaStem's patent rights. As demonstrated herein, there can be little dispute that, *inter alia*, as a private cord blood bank CBR operates an infringing business. As a result, an injunction is absolutely necessary to prevent irreparable damage to the value of the Patents-In-Suit. In this regard, further relevant facts are set forth below.

## IV.    ARGUMENT

A.    **PHARMASTEM IS ENTITLED TO PRELIMINARY INJUNCTIVE RELIEF AGAINST CBR'S INFRINGEMENT OF THE PATENTS-IN-SUIT.**

35 U.S.C. § 283 expressly authorizes trial courts to grant preliminary injunctive relief in patent infringement cases. 35 U.S.C. § 283 ("The several courts having jurisdiction of cases under this title may grant injunctions in accordance with the principles of equity to prevent the violation of any right secured by patent, on such terms as the court deems reasonable."); *see Oakley, Inc. v. Sunglasses Hut Int'l*, 316 F.3d 1331, 1338-39 (Fed. Cir. 2003); *see also Hybritech, Inc. v. Abbot Labs.*, 849 F.2d 1446, 1456-57 (Fed. Cir. 1988)("The patent statute provides injunctive relief to preserve the legal interest of the parties against future infringement which may have market effects never fully compensable in money.").

PharmaStem "is entitled to a preliminary injunction if it shows the following four factors: (1) a reasonable likelihood of success on the merits; (2) irreparable harm absent an injunction; (3) that the balance of hardships tips in its favor; and (4) that the public interest favors an injunction." *Tate*, 279 F.3d at 1364-65 (citations omitted). "In order to

---

[2] *See, e.g.*, Kobialka Decl., Exh. 3 (BBC Documentary, *passim*), Exh. 26 (Gluckman medical journal article at 1197), and Exh. 31 (Koh medical journal article at 1).

PHARMASTEM'S MOTION FOR A PRELIMINARY
INJUNCTION AGAINST CBR
CASE NO. 04-3072 JSW                3

demonstrate likely success on the merits, [PharmaStem] must show that, in light of the presumptions and burdens applicable at trial, it will likely prove that [CBR] infringes the asserted claims of the [Patents-In-Suit] and that the patent[s] will likely withstand [CBR's] challenges to [their] validity." *Id.* at 1365 (citations omitted).

Lastly, the proof required for the grant of a preliminary injunction is "no more nor less stringent in patent cases than in other areas of law." *See H.H. Robertson Co. v. United Steel Deck, Inc.,* 820 F.2d 384, 387 (Fed. Cir. 1987), *overruled on other grounds by, Markman v. Westview Instruments, Inc.,* 52 F.3d 967, 977 (Fed. Cir. 1995). In the case of proving patent infringement, PharmaStem's burden of proof is by a preponderance of the evidence. *Hughes Aircraft Co. v. United States,* 717 F.2d 1351, 1361 (Fed. Cir. 1983). Moreover, at the preliminary-injunction stage, a party is not required to prove his case in full and the findings of fact and conclusions of law made by a court granting a preliminary injunction are not binding at trial on the merits. *Univ. of Tex. v. Camenisch,* 451 U.S. 390, 395 (1981).

**B.    THERE IS A REASONABLE LIKELIHOOD OF SUCCESS ON THE MERITS OF PHARMASTEM'S PATENT INFRINGEMENT CLAIMS AGAINST CBR.**

**1.    CBR's Cord Blood Banking Activities Infringe the Patents-In-Suit.**

"An assessment of the likelihood of infringement, like a determination of patent infringement at a later stage in litigation, requires a two-step analysis. First, the court determines the scope and meaning of the patent claims asserted ... [Secondly,] the properly construed claims are compared to the allegedly infringing device." *Oakley,* at 1339 (internal quotations omitted), citing, *Cybor Corp. v. FAS Techs., Inc.,* 138 F.3d 1448, 1454 (Fed. Cir. 1998)(en banc)(citations omitted). "Step two, comparison of the claim to the accused device, requires a determination that every claim limitation or its

equivalent be found in the accused device." *Id.* at 1339, citing, *Warner-Jenkinson Co. v. Hilton Davis Chem. Co.,* 520 U.S. 17, 29 (1997).

### a.    PharmaStem's Proposed Claim Construction.

A patent's scope is determined by its claims. *Digital Biometrics Inc. v. Identix, Inc.,* 149 F.3d 1335, 1344 (Fed. Cir. 1998). The interpretation of claim language is a matter of law, and is thus reserved exclusively for the Court. *Markman v. Westview Instruments, Inc.,* 517 U.S. 370, 372 (1996). In construing the claims, the Court is to ascertain the meaning they would have for one of ordinary skill in the art who had read the patent's disclosure and public record—the claims, the specification, and the prosecution history. *Markman,* 517 U.S. at 370. This public record constitutes the "intrinsic evidence" from which the patent's scope must be discerned. *Vitronics Corp. v. Conceptronic Inc.,* 90 F.3d 1576, 1582 (Fed. Cir. 1996).

Claim terms are to be accorded their ordinary and accustomed meaning unless they lack such ordinary meaning, or unless the context makes clear that some other meaning should apply. *Johnson Worldwide Associates, Inc. v. Zebco Corp.,* 175 F.3d 985, 989 (Fed. Cir. 1999). As stated by the Federal Circuit, claims "must be construed in light of the intrinsic factors . . . [which include] the specification, the claims, and the prosecution history. Within such intrinsic evidence, there is a hierarchy of analytical tools. The actual words of the claims are the controlling focus." *Digital Biometrics,* 149 F.3d at 1344. Where the claim language itself is ambiguous, the specification provides "the single best guide to the meaning of [the] disputed term." *Vitronics,* 90 F.3d at 1582. In such cases, the specification is usually "dispositive." *Id.*

PharmaStem anticipates that it will assert, at least, the Claim 17 of the '645 Patent, Claim 46 of the '427 Patent, and Claim 49 of the '427 Patent against CBR in this litigation, and proposes the following construction for such claims.[3]

| Claim 17 of the '645 Patent | |
| --- | --- |
| Claim Language (Terms Potentially Requiring Construction in **Bold**) | PharmaStem's Proposed Construction |
| 17. A pharmaceutical composition comprising (a) viable human neonatal or fetal **hematopoietic stem cells** derived from the umbilical cord or placental blood of a single human collected at the birth of said human, | PROPOSED CONSTRUCTION:  cells capable of effecting repopulation of blood and other hematopoietic organs. |
| in which said cells are present **in an amount sufficient to effect hematopoietic reconstitution of a human adult,** | This claim term requires no construction. If the term "in an amount sufficient" or the term "hematopoietic reconstitution" requires construction, then PharmaStem proposes the following construction.<br><br>PROPOSED CONSTRUCTION:  in an amount that is as much as is needed to effect repopulation of a human adult's blood and other hematopoietic organs. |
| which cells have been **cryopreserved**; and | This claim term requires no construction. If the term "cryopreserved" requires construction, then PharmaStem offers the following construction.<br><br>PROPOSED CONSTRUCTION:  stored at very low temperatures. |
| (b)  a **pharmaceutically acceptable carrier**. | This claim term requires no construction. If the term "pharmaceutically acceptable carrier" requires construction, then PharmaStem offers the following construction.<br><br>PROPOSED CONSTRUCTION:  any medically acceptable carrier, including but |

[3] PharmaStem's proposed claim construction is further supported by the evidence set forth in the claim charts at Appendix A to this motion.

PHARMASTEM'S MOTION FOR A PRELIMINARY
INJUNCTION AGAINST CBR
CASE NO. 04-3072 JSW                         6

40923-0005/BY043560.059]

| | not limited to saline, buffered saline, dextrose and water. |
|---|---|
| **Claim 46 of the '427 Patent** | |
| Claim Language (Terms Potentially Requiring Construction in **Bold**) | PharmaStem's Proposed Construction |
| 46. A method for treating a human patient in need of hematopoietic reconstitution comprising introducing into the human patient a composition comprising human neonatal or fetal **hematopoietic stem cells** derived from the umbilical cord blood or placental blood of a human collected at birth of said human, | PROPOSED CONSTRUCTION: cells capable of effecting repopulation of blood and other hematopoietic organs. |
| in which the stem cells have been previously **cryopreserved**, | This claim term requires no construction. If the term "cryopreserved" requires construction, then PharmaStem offers the following construction.<br><br>PROPOSED CONSTRUCTION: stored at very low temperatures. |
| so as to provide **hematopoietic reconstitution**. | This claim term requires no construction. If the term "hematopoietic reconstitution" requires construction, then PharmaStem proposes the following construction.<br><br>PROPOSED CONSTRUCTION: repopulation of a human patient's blood and other hematopoietic organs. |
| **Claim 49 of the '427 Patent** | |
| Claim Language (Terms Potentially Requiring Construction in **Bold**) | PharmaStem's Proposed Construction |
| 49. A method for storing human neonatal or fetal hematopoietic stem cells derived from the blood, said method comprising **cryopreserving** human neonatal or fetal blood components | This claim term requires no construction. If the term "cryopreserving" requires construction, then PharmaStem offers the following construction.<br><br>PROPOSED CONSTRUCTION: storing at very low temperatures. |
| containing human neonatal or fetal **hematopoietic stem cells** from the umbilical cord blood or placental blood of a single human collected at the birth | PROPOSED CONSTRUCTION: cells capable of effecting repopulation of blood and other hematopoietic organs. |

| of said human, such that the cells remain viable, | |
|---|---|
| in which said cells are present **in an amount sufficient to effect hematopoietic reconstitution of a human adult**. | This claim term requires no construction. If the term "in an amount sufficient" or the term "hematopoietic reconstitution" requires construction, then PharmaStem proposes the following construction. PROPOSED CONSTRUCTION:  in an amount that is as much as is needed to effect repopulation of a human adult's blood and other hematopoietic organs. |

As can be seen from PharmaStem's above-proposed claim construction, it is unlikely that many of the claim terms require any construction other than their plain and ordinary meaning to a person of skill in the art.  Nor does PharmaStem anticipate that many of the proposed claim constructions will be disputed, because the same terms have been previously construed in a prior litigation between PharmaStem and CBR, among others, involving related patents.[4]  *See Mycogen Plant Science, Inc. v. Monsanto Co.*, 252 F.3d 1306, 1310-12 (Fed. Cir. 2001)(the terms of the claims of related patents construed in one action should be construed consistently in subsequent actions), *vacated on other grounds* by *Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.*, 535 U.S. 722 (2002).

Indeed, the only term that PharmaStem expects may be disputed is the "in an amount sufficient to effect hematopoietic reconstitution of a human adult" term found in Claim 17 of the '645 Patent and Claim 49 of the '427 Patent.  In the prior litigation, the entire phrase "[hematopoietic stem cells] in an amount sufficient to effect hematopoietic reconstitution of a human adult" was construed to mean "present in an amount that is as

---

[4] *See* Joint Status Report on Motions and Notices of Pendency of Other Proceedings at 3 (Docket No. 47)(regarding status of *PharmaStem v. ViaCell, et al.*, Civ. Case No. 02-148 GMS (D. Del.), filed on February 22, 2002); Joint Case Management Statement at 3 (Docket No. 97)(regarding update of status of same); *compare* Kobialka Decl., Exh. 4, at page 15.

1    much as is needed to effect hematopoietic reconstitution of a human adult."[5]  As can be

2    seen from the prior claim construction, the term "in an amount sufficient" was given its

3    plain meaning, while the term "hematopoietic reconstitution" was not construed at all.

4    Therefore, if construction is required, "in an amount sufficient to effect hematopoietic

5    reconstitution of a human adult" should be construed as "present in an amount that is as

6    much as is needed to effect hematopoietic reconstitution of a human adult," consistent

7    with the prior claim construction.

8            **b.    CBR's Cord Blood Units ("CBUs") Meet Every**
9                 **Limitation    of Claim 17 of the'645 Patent.**

10           In its "Cord Blood Banking Overview," CBR explains that "[c]ord blood banking

11   is the process of collecting blood from a newborn's umbilical cord immediately after

12   delivery and cryogenically storing it for future potential medical uses."[6]  As CBR itself

13   proclaims, "Cord Blood Registry is the world leader in cord blood stem cell banking.  We

14   set the gold standard for storing and processing cord blood stem cells."[7]  Accordingly, it

15   should come as no surprise that CBR practices the very inventions which pioneered the

16   industry in which it operates.[8]

17                    **(i)    CBR's CBUs are pharmaceutical**
18                         **compositions comprising "viable human**
                          **neonatal or fetal hematopoietic stem cells**
19                         **derived from the umbilical cord or**
                          **placental blood of a single human**
20                         **collected at the birth of said human, which**
                          **have been cryopreserved."**
21
         The following excerpts from CBR's website constitute just some of the
22
     overwhelming evidence that CBR's CBUs meet the above claim limitations.
23

24           [5] *See* Kobialka Decl., Exh. 4, at page 15.

25           [6] *See* Kobialka Decl., Exh. 5, at page 1.

         [7] *See* Kobialka Decl., Exh. 6, at page 1.
26
         [8] For the Court's convenience, infringement charts are provided at Appendix B
27   to this motion.

28   PHARMASTEM'S MOTION FOR A PRELIMINARY
     INJUNCTION AGAINST CBR
     CASE NO. 04-3072 JSW            9

CBR's CBU's are pharmaceutical compositions comprising *human neonatal or fetal hematopoietic cells derived from the umbilical cord of placental blood of a single human collected at the birth of said human*:

- "Cord blood, which is also called 'placental blood,' is the blood that remains in the umbilical cord and placenta following birth and after the cord is cut. Cord blood is routinely discarded with the placenta and umbilical cord. Your baby's umbilical cord blood is a valuable source of stem cells, which are genetically unique to your baby and family."[9]

- "The stem cells found in cord blood are the building blocks of your blood and immune system and most readily reproduce into:
  - Red Blood Cells—which carry oxygen to all the cells in the body
  - White Blood Cells—which fight infection
  - Platelets—which aid in clotting in the event of injury"[10]

- "Currently, stem cells are primarily used in transplant medicine to regenerate a patient's blood and immune system after they have been treated with chemotherapy and/or radiation to destroy cancer cells. At the same time the chemotherapy and radiation destroys the cancer cells in a patient, they also destroy stem cells. Therefore, an infusion of stem cells or a stem cell transplant is performed after the chemotherapy and/or radiation treatment. The stem cells then migrate to the patient's bone marrow where they multiply and regenerate all of the cells to create a new blood and immune system for the patient."[11]

- "Cord blood is collected from the umbilical cord immediately after the birth of the baby and after the cord has been cut. This blood is routinely discarded and collecting it does not alter normal birthing procedures. The collection can only take place at the time of delivery and is normally performed by your caregiver."[12]

- "You will receive a collection kit for your baby's cord blood stem cells. Your kit contains all the items your caregiver will need to collect your baby's cord blood. However, you must remember to take the kit with you to the hospital when you deliver."[13]

---

[9] *See* Kobialka Decl., Exh. 7, at page 1.

[10] *See* Kobialka Decl., Exh. 7, at page 2.

[11] *See* Kobialka Decl., Exh. 7, at page 2.

[12] *See* Kobialka Decl., Exh. 8, at pages 1-2.

[13] *See* Kobialka Decl., Exh. 8, at page 3.

■ "After the collection, the labor and delivery staff will return the collection kit to you or a designated family member. The collection kit is pre-labeled and is ready to be shipped 'as-is.' . . . CBR's automated tracking system will monitor your shipment until it is safely delivered to our lab."[14]

CBR's CBU's are *cryopreserved*:

■ **"How do you process the cord blood?** We use a proprietary density gradient separation method, the highest standard adapted for cord blood processing. Our expert laboratory technicians take the extra step of removing the red blood cells from your baby's cord blood sample. Our processing method is preferred by transplant physicians because:
- It minimizes the risk of blood type (ABO) incompatibility if the cord blood is needed for someone other than the newborn.
- It significantly reduces the use of DMSO, a protectant used in cryopreservation, which can cause problematic side effects when a sample is used.
- It minimizes free hemoglobin which is released when red blood cells that remain in the sample burst during the thawing process. Free hemoglobin stresses the kidneys of the transplant recipient. Additionally, the bursting of the red blood cells reduces stem cell viability."[15]

CBR's CBU's comprise *viable* cord blood stem cells:

■ **"How long can cord blood stem cells be stored in liquid nitrogen?** 'There is no evidence at present that [cord blood stem] cells stored at minus 196 degrees Celsius in an undisturbed manner lose either in vitro-determined viability or biological activity. Therefore, at the current time, no expiration date need be assigned to cord blood stored continuously under liquid nitrogen.'—Guidelines for Collection, Processing and Storage of Cord Blood Stem Cells; New York State Department of Health[.] Current data reflects that cord blood cells stored for fifteen years have the same composition as they did at the time of storage. All science involving cryogenic storage of cells also indicates that the cells should remain viable indefinitely."[16]

         **(ii)**    **CBR's CBUs comprise hematopoietic stem cells "in an amount sufficient to effect hematopoietic reconstitution of a human adult."**

---

[14] *See* Kobialka Decl., Exh. 9, at page 1.

[15] *See* Kobialka Decl., Exh. 10, at page 2.

[16] *See* Kobialka Decl., Exh. 10, at page 4.

---

The following excerpts from CBR's publications and website and summary of the scientific evidence constitute just some of the overwhelming evidence that CBR's CBUs comprise ***a sufficient amount of hematopoietic stem cells to effect hematopoietic reconstitution of a human adult***. (Notably, there is no actual requirement in Claim 17 of the '645 Patent that the CBU must reconstitute an adult, if used, but merely that there be enough stem cells to do so.)

### CBR's Own Admissions and Representations.

In a CBR publication, reprinting an interview with Peter D. Weiss, M.D., Assistant Clinical Professor, Obstetrics and Gynecology at the UCLA School of Medicine, the issue of sufficiency for potential adult use is addressed as follows:

> Question: "Does blood from the umbilical cord contain a sufficient quantity of stem cells for use in an adult patient?"
>
> Answer: "Yes. A recent article in The New England Journal of Medicine (June 14, 2002) by M.J. Laughlin and other researchers established that umbilical cord blood contains enough stem cells for use by an adult. The article, "Hematopoietic engraftment and survival in adult recipients of umbilical cord blood from unrelated donors," appears on the Cbr Web site, www.cordbood.com/science."[17]

Dr. Weiss goes on to suggest that other physicians should counsel their expecting patients to bank their children's cord blood because "siblings, ***parents*** or even cousins with a matching HLA may also benefit from privately banked stem cells."[18]

Currently on CBR's website, there is a similar interactive question and answer session with David T. Harris, Ph.D., CBR's Cord Blood Stem Cell Processing and Storage Laboratory Director and a member of CBR's Scientific and Medical Advisory Board.[19] On it, Dr. Harris straightforwardly states that the cord blood collected by CBR can be used for adults:

---

[17] *See* Kobialka Decl., Exh. 11, at page 5.

[18] *See* Kobialka Decl., Exh. 11, at page 5.

[19] *See* Kobialka Decl., Exh. 12, at page 5, and Exh.13, at pages 1-2.

Question: "Who in the family can use the newborn's stem cells?"

Answer: "The potential uses of cord blood within the family are many. Not only can the child from whom the cord blood was obtained use it, but *there are also uses for the mother*, and there's a fifty-fifty chance of use for the other brothers and sisters in the family."[20]

In addition to the evidence adduced above, the following excerpts from CBR's website constitute just some of the overwhelming evidence that CBR's CBUs meet the above claim limitation.

- **"Why do families choose to collect and store their baby's cord blood?** A Once-in-a-Lifetime Opportunity—Only at Birth[.] At an increasing rate, expectant parents are storing cord blood for their families, not only as a potential life-saving resource for current uses of stem cells, but also for their future potential. *Some families have more defined risk factors, but most often, parents bank for the security in knowing the health benefits stem cells may someday offer their children, themselves, or other family members.*"[21]

- **"Family Use** One of the unique characteristics about your baby's cord blood stem cells is that they can be used by siblings or other relatives in many circumstances where bone marrow stem cells cannot. . . *First- and second-degree relatives of the newborn, including siblings, parents, grandparents, cousins, aunts, and uncles, may be a sufficient match to use the stem cells.*"[22]

- **"The Benefits of Family Cord Blood Banking** Cord blood stem cells are not just for your baby. It's really an investment for the whole family. Virtually all mothers and about half siblings will be a suitable match for baby's stem cells." (Endorsement by Robert Sears, M.D.)[23]

- **"Here is what medical experts have to say: CORD BLOOD AND ADULT USE** 'Umbilical-cord blood from unrelated donors can restore hematopoiesis in adults who receive myeloablative therapy and is associated with acceptable rates of severe acute and chronic GVHD.' Mary

---

[20] *See* Kobialka Decl., Exh. 14, at accompanying Transcript.

[21] *See* Kobialka Decl., Exh. 15, at page 2.

[22] *See* Kobialka Decl., Exh. 16, at page 2 (emphasis added).

[23] *See* Kobialka Decl., Exh. 17, at page 2.

PHARMASTEM'S MOTION FOR A PRELIMINARY
INJUNCTION AGAINST CBR
CASE NO. 04-3072 JSW                     13

J. Laughlin, M.D., Juliet Barker, M.D., Barbara Bambach, M.D., et. al. New England Journal of Medicine, June 14, 2001[.]"[24]

- **"If my family ever needs the sample how do we retrieve it?** Should the need arise, Cord Blood Registry's client services department and your physician would make arrangements for confirmatory testing, release, and transportation of your baby's stem cells to a designated hospital."[25]

- **"Have any of your samples been requested for use in transplant?** Yes. We have more experience providing samples for use in transplant than any other family bank. To date, Cord Blood Registry has provided thirty samples for use in transplantation. In all cases, the stem cells proved viable for transplant—the ultimate validation of our collection, processing, and storage procedures. While most samples have been used for siblings, our samples have been used in two other notable transplants:
  - *Newborn to Mom. A newborn's cord blood stem cells were transplanted to her mother to treat chronic myelogenous leukemia (CML)....*"[26]

However, perhaps the best evidence that CBR stores and offers to store cord blood units containing hematopoietic stem cells in an amount that is as much as is needed to effect repopulation of a human adult's blood and other hematopoietic organs, lies in its **"Quality Service Guarantee."**[27] CBR guarantees that "[a]s a client of Cord Blood Registry, your baby's sample is backed by our unique quality service guarantee. If you need to use your child's cord blood stem cells for transplantation and the cells fail to engraft, you'll receive a refund of all fees paid to CBR and an additional $50,000."[28] Indeed, while CBR disclaims that "[b]anking cord blood stem cells does not guarantee that the cells will be useful for every situation" and that "[u]ltimate use will depend on the physician's determination of disease type and HLA matching between the donor and recipient," even CBR's "Disclaimer" provides that "[t]he cord blood stem cells from a

---

[24] *See* Kobialka Decl., Exh. 18, at page 3.
[25] *See* Kobialka Decl., Exh. 10, at pages 5-6.
[26] *See* Kobialka Decl., Exh. 10, at page 6 (emphasis added).
[27] *See* Kobialka Decl., Exh. 19.
[28] *See* Kobialka Decl., Exh. 19.

PHARMASTEM'S MOTION FOR A PRELIMINARY
INJUNCTION AGAINST CBR
CASE NO. 04-3072 JSW                    14

newborn are an exact HLA match for the newborn from which they were obtained **and may also be a useful match for the mother, father, sibling, or cousin**."[29]

### CBR's Actual Transplants.

Providing further proof that CBR's CBUs contain stem cells in an amount sufficient to effect hematopoietic reconstitution of a human adult, CBR has actually transplanted some of its stored CBUs into adults. In relevant part, the following chart summarizes the adult and/or near-adult use data provided on CBR's website.[30]

| Tx # | Date of Tx | Recipient Sex/Age (years) | Recipient Relationship | Volume without Anticoagulant | Total CFU/CD 34+ Cells | Engraftment/ # of Days |
|---|---|---|---|---|---|---|
| 11 | 2/12/00 | F/16.7 | Sibling | 138cc | $6.6 \times 10^6$ CD34+ | Engrafted/33 |
| 14 | 5/18/01 | F/43.6 | Mother | 61cc | N/A | Engrafted |
| 16 | 6/14/01 | M/18.1 | Sibling | 120cc | $2.4 \times 10^6$ CD34+ | Engrafted/16 |

The above data indisputably demonstrate that at least three of CBR's CBUs contained stem cells in an amount sufficient to effect engraftment in transplant patients of ages 16.7 years-old, 18.1 years-old, and 43.6 years-old.

CBR's transplantation evidence proves beyond a shadow of a doubt that the above three CBUs met the sufficiency for adult use claim limitation, but PharmaStem is not required to prove infringement beyond all doubt. Significantly, the Patents-In-Suit do not cover therapeutic compositions that guarantee patient survival, but cover therapeutic compositions which can help toward that end by providing reconstitution of impaired blood and immune systems. Thus, the proper measure of infringement is not sufficiency to ensure patient survival, but sufficiency for engraftment and reconstitution—the very

---

[29] *See* Kobialka Decl., Exh. 20 (emphasis added).

[30] *See* Kobialka Decl., Exh. 21.

thing CBR guarantees. Moreover, regardless of the above transplants actual successful engraftments, the fact that they were even tried conclusively proves that, in each and every case, the transplant physicians believed that such units contained stem cells in an amount sufficient to effect hematopoietic reconstitution in the adult patient. Logically, a transplant physician would not violate his or her Hippocratic oath to give no deadly medicine by attempting a cord blood stem cell transplant with a CBU that did *not* contain stem cells in an amount sufficient to effect hematopoietic reconstitution in the patient. Accordingly, the above evidence also constitutes persuasive circumstantial proof that, in general, CBR's CBUs more probably than not satisfy the sufficiency for adult use claim limitation. In light of the above evidence, CBR should be hard-pressed to assert, for the purposes of litigation only, that it does not store cord blood units for possible adult use, if needed.

### The Scientific Evidence.

Additionally, overwhelming scientific evidence exists to support CBR's storage and offer to store cord blood units containing hematopoietic stem cells in an amount that is as much as is needed to effect repopulation of a human adult's blood and other hematopoietic organs. As a preliminary matter, the '645 Patent and the '427 Patent, themselves, disclose that "[i]n a preferred embodiment, volumes of 50 ml or more of neonatal blood are obtained," citing information that "suggests that as little as 50 ml of cord blood contains enough of the appropriate cells to repopulate the hematopoietic system of an adult, and it is possible that even less cord blood would have the same effect." '645 Patent at col. 11:55 to col. 12:20; '427 Patent at col. 13:32-45. Importantly, what is claimed is "an amount sufficient," and not the preferred embodiment, *i.e.*, approximately 50 ml. To that end, the current scientific and medical consensus is that a typical cord blood collection is of sufficient size for use in almost all transplant conditions, regardless of patient age. Thus, all, or almost all, of CBR's CBUs are

1    reasonable likely to be sufficient to effect repopulation of a human adult's blood and other

2    hematopoietic organs.  In addition to the evidence adduced above, the following excerpts

3    from the scientific evidence constitute just some of the overwhelming evidence that

4    CBR's CBUs meet the above claim limitation.[31]

5
6        ▪  Harris, D. T., *Cord Blood Banking and Its Potential Clinical
          Applications*.[32]

7        As early as 1995, Dr. David T. Harris, CBR's own Laboratory Director and

8    member of its Medical and Scientific Advisory Board, already observed that "questions

9    have been raised as to whether cord blood transplantation would ever be suitable for adult

10   use, or restricted to use in children.  To date, the smallest amount of cord blood ever used

11   in a successful transplant has been 43 cc, and the largest patient ever successfully

12   transplanted is now 85 kg.  ***Thus, it appears that a typical cord blood collection is of***

13   ***sufficient size for use in almost all transplant conditions.***"  At page 3 (emphasis added).

14       ▪  Laughlin, M. J., *et al.*, *Hematopoietic Engraftment And Survival In Adult
15          Recipients Of Umbilical-Cord Blood From Unrelated Donors*, New
          England Journal of Medicine (2001)("Laughlin").[33]

16       The Laughlin study, published in 2001, was one of the first large-scale, multi-

17   center studies to conclude that cord blood contains a sufficient number of stem cells to

18   reconstitute an adult.  In brief, the Laughlin study spanned five years, from 1995 to 2000,

19   and tracked the health of 68 adult patients with life-threatening blood disorders who

20   received transplants of cord blood from unrelated donors.  At 1815-16.  The subject

21   patients ranged from 17 to 58 years of age, and ranged in weight from 40.9 kg to 115.5

22   kg, at the time of transplantation.  At 1817.

23

24   _____

25       [31] Summaries of this and further scientific evidence are provided at Appendix
     C to this motion.

26       [32] *See* Kobialka Decl., Exh. 22.

27       [33] *See* Kobialka Decl., Exh. 23.

28   PHARMASTEM'S MOTION FOR A PRELIMINARY
     INJUNCTION AGAINST CBR
     CASE NO. 04-3072 JSW       17

The purpose of this study was to determine whether cord blood contained stem cells in an amount sufficient to reconstitute an adult.  The results demonstrated that approximately 90% of the subject patients achieved hematopoietic recovery.  At 1817.  Furthermore, the study found no correlation between cell dose and speed of hematopoietic recovery, where the cell doses ranged from 10 million to 63 million nucleated cells per kilogram of the recipient's body weight.  At 1816-18.

Accordingly, the Laughlin study concluded:
> **"*In summary, the results of this study demonstrate that HLA-mismatched umbilical-cord blood from unrelated donors is a feasible alternative source of hematopoietic stem cells for transplantation in adults.*** Hematopoietic reconstitution occurred in 90 percent of our patients, and the incidence and severity of GVHD were low despite HLA mismatching." At 1821 (emphasis added).

The Laughlin study is a powerful testament to the capability of the cord blood from a single newborn donor to repopulate the entire hematopoietic system of a needy adult patient.  At 1818.  Whereas "[r]apid engraftment of marrow from siblings and unrelated donors is related to the dose of cells, the number of CD34+ cells, and the degree of HLA matching," the Laughlin study found that the same correlations did not hold true with respect to cord blood stem cell transplantation.  At 1819-20.  Thus, even relatively small cord blood units are highly likely to contain stem cells in an amount sufficient to effect hematopoietic reconstitution.

- ▪ *Umbilical Cord Stem Cell Transplants Should Not Be Limited By Age*, The Blue Sheet (Food and Drug Administration), March 5, 2003 ("FDA Blue Sheet").[34]

In 2003, the FDA's Biological Response Modifiers Advisory Committee ("Advisory Committee") agreed that "[p]lacental *cord blood transplant recipient age should not be a factor*." At 21 (emphasis added).  Notably, "the committee did not want to put a firm figure on minimum or maximum cell doses…" *Id.* The Advisory

---

[34] *See* Kobialka Decl., Exh. 24.

PHARMASTEM'S MOTION FOR A PRELIMINARY
INJUNCTION AGAINST CBR
CASE NO. 04-3072 JSW                18

Committee's determination, not only sets forth the most reliable indicator of the current state of the art, but also underscores the importance of the Laughlin study's finding that there was no correlation between cell dose, once a threshold amount is present, and the speed of hematopoietic recovery.

        **(iii)**     **CBR's CBUs also comprise "a pharmaceutically acceptable carrier," thus meeting every limitation of Claim 17 of the '465 Patent.**

As described by the '645 Patent, "a pharmaceutically acceptable carrier" is broadly defined as "any sterile biocompatible pharmaceutical carrier, including but not limited to saline, buffered saline, dextrose and water." *See* '645 Patent at col. 24:14-19.  The '645 Patent discusses various techniques that involve the addition or use of various substances for various purposes ancillary to ultimate purpose of the invention.  For example, the '645 Patent describes the use of various anticoagulants well-known in the art that, though not necessary, may be helpful.  '645 Patent at col. 11:27-41.  The anticoagulants discussed include but are not limited to CPD (citrate-phosphate-dextrose), ACD (acid citrate-dextrose), various solutions, glucose mixtures, and heparin.  *Id.*  The '645 Patent also describes the use of cryoprotective agents well-known in the art that, though not necessary, may be helpful.  The cryoprotectants discussed include but are not limited to dimethyl sulfoxide (DMSO), polyethylene glycol, albumin, dextran, sucrose, and ethylene glycol.  '645 Patent at col. 20:24-51.  The use of any of the above-described substances would satisfy the "pharmaceutically acceptable carrier" claim limitation.

Indeed, with respect to the use of DMSO, the '645 Patent teaches that the "[a]ddition of plasma (*e.g.*, to a concentration of 20-25%) can augment the protective effect of DMSO." *Id.*  To that end, the '645 Patent further teaches that "[i]f desired, autologous plasma can be removed for use in the freezing process."  '645 patent at col. 17:35-36.  Thus, even plasma from the cord blood sample itself can also constitute a pharmaceutically acceptable carrier.  Accordingly, the use of any of the substances

described above, or others disclosed in the '645 Patent, or others not described, would satisfy the "pharmaceutically acceptable carrier" claim limitation.

CBR uses anticoagulants during the collection of the cord blood.[35] CBR also uses the cryoprotectant DMSO in processing the CBU for cryogenic storage.[36] Furthermore, DMSO must be diluted, meaning CBR likely uses yet another pharmaceutically acceptable carrier in its CBUs. Additionally, CBR also separates out the red blood cells from its CBUs,[37] meaning that it most likely adjusts its CBU volumes with yet another pharmaceutically acceptable carrier for storage in its CBU "cryovials."[38] Thus, CBR's CBUs indisputably meet the above claim limitation. In summary, all of the above evidence strongly shows that CBR offers cord blood banking services which infringe at least Claim 17 of the '645 Patent, and that PharmaStem is reasonably likely, of not more than reasonably likely, to succeed on the merits at trial.

### c. CBR's CBUs Meet Every Limitation of Claim 46 of the '427 Patent.

Claim 46 of the '427 Patent claims:

A method for treating a human patient in need of hematopoietic reconstitution comprising introducing into the human patient a composition comprising human neonatal or fetal hematopoietic stem cells derived from the umbilical cord blood or placental blood of a human collected at birth of said human, in which the stem cells have been previously cryopreserved, so as to provide hematopoietic reconstitution.

Notably, this claim lacks the suitability for adult use limitation present in Claim 17 of the '645 Patent, requires "*introducing into the human patient*," which is absent from Claim 17 of the '645 Patent, but otherwise has the same claim limitations as Claim 17 of the '645 Patent. According to CBR's own description of the therapeutic use of its CBUs,

---

[35] *See* Kobialka Decl., Exh. 34.

[36] *See* Kobialka Decl., Exh. 12, at page 2.

[37] *See* Kobialka Decl., Exh. 12, at page 2.

[38] *See* Kobialka Decl., Exh. 35.

"an infusion of stem cells or a stem cell transplant is performed after the chemotherapy and/or radiation treatment. The stem cells then migrate to the patient's bone marrow where they multiply and regenerate all of the cells to create a new blood and immune system for the patient."[39]  Accordingly, the same evidence as that adduced above indisputably demonstrates that CBR has induced the infringement this claim at least thirty times in the past, by providing at least thirty of its CBUs for transplantation, or introduction into a human patient, and is imminently likely to do so again in the future.[40] *See* 35 U.S.C. § 271(c).

PharmaStem submits this particular evidence and argument in support of its need for some measure of preliminary injunctive relief against CBR.[41]  As discussed in greater detail below, PharmaStem merely seeks to prevent CBR from gaining *new* clients and market share in an infringing manner, to the detriment of PharmaStem and its existing licensees.

      **d.**     **CBR's CBUs Meet Every Limitation of Claim 49 of the '427 Patent.**

Claim 49 of the '427 Patent claims:

> A method for storing human neonatal or fetal hematopoietic stem cells derived from the blood, said method comprising cryopreserving human neonatal or fetal blood components containing human neonatal or fetal hematopoietic stem cells from the umbilical cord blood or placental blood of a single human collected at the birth of said human, such that the cells remain viable, in which said cells are present in an amount sufficient to effect hematopoietic reconstitution of a human adult.

---

[39] *See* Kobialka Decl., Exh. 7, at page 2.

[40] *See, e.g.,* Kobialka Decl., Exh. 10, at page 6, Exh. 21.

[41] Despite CBR's clear likelihood of inducing infringement Claim 46 of the '427 Patent, PharmaStem does not desire to hinder the provision of a cord blood unit to potentially needy patients.  PharmaStem is willing to tailor any injunction to permit CBR to continue to provide *existing* CBUs to clients on demand.  PharmaStem respectfully tenders that such a course of action should further tip the balance in favor of granting PharmaStem the limited preliminary injunctive relief it seeks.

PHARMASTEM'S MOTION FOR A PRELIMINARY
INJUNCTION AGAINST CBR
CASE NO. 04-3072 JSW      21

1

2    Notably, this claim lacks the "pharmaceutically acceptable carrier" limitation of

Claim 17 of the '645 Patent, but otherwise has the same claim limitations as Claim 17 of

3    the '645 Patent.  Accordingly, the same evidence as that adduced above clearly shows that

4    CBR reasonably likely also infringes this claim of the '427 Patent.

5

6    **2.    The Patents-In-Suit will Reasonably Likely Withstand the
        Defendants'    Challenges to their Validity and Enforceability.**

7    "An assessment of the likelihood of validity of a patent claim over the prior art

8    also involves a two-step process.  The first step is the same claim construction implicated

9    in an infringement analysis." *Oakley*, at 1339, citing, *Smiths Indus. Med. Sys., Inc. v.*

10   *Vital Signs, Inc.,* 183 F.3d 1347, 1353 (Fed. Cir. 1999).  "The second step involves a

11   comparison of the asserted claims with the prior art." *Id.*, citing, *Celeritas Techs. Inc. v.*

12   *Rockwell Int'l Corp.,* 150 F.3d 1354, 1360 (Fed. Cir. 1998).  "Because an issued patent is

13   presumed to be valid, 35 U.S.C. § 282, the evidentiary burden to show facts supporting a

14   conclusion of invalidity is clear and convincing evidence, *WMS Gaming Inc. v. Int'l Game*

15   *Tech.,* 184 F.3d 1339, 1355 [] (Fed. Cir. 1999)." *Id.*

16   At this stage of the proceedings, the Patents-In-Suit are presumed valid.  35 U.S.C.

17   § 282.  Moreover, PharmaStem notes that the reexamined "grandfather" patent of the

18   patent family of the Patents-In-Suit twice passed scrutiny in the Patent and Trademark

19   Office.  PharmaStem anticipates that CBR will not be able to adduce any new prior art

20   that has not already been considered and reconsidered by the Patent and Trademark

21   Office.  Accordingly, CBR should be doubly hard-pressed to raise a substantial question

22   of validity with respect to the Patents-In-Suit.  *Compare Transmatic, Inc. v. Gulton*

23   *Indus., Inc.,* 53 F.3d 1270 (Fed. Cir. 1995)(district court properly granted summary

24   judgment dismissing the accused infringer's invalidity defense because, *inter alia*, the

25   patent claims had "twice passed scrutiny in the PTO, including a reexamination procedure

26   in which [the accused infringer] participated as the requester).

27

28   PHARMASTEM'S MOTION FOR A PRELIMINARY
     INJUNCTION AGAINST CBR
     CASE NO. 04-3072 JSW                22

1

2     For all of the above reasons, because PharmaStem has demonstrated likely success

3     on the merits, in light of the presumptions and burdens applicable at trial, that it will

4     likely prove that CBR infringes the asserted claims of the Patents-In-Suit and that the

5     Patents-In-Suit will likely withstand CBR's, or any other defendants', challenges to their

6     validity, PharmaStem has satisfied the first factor entitling it to a preliminary injunction

7     against CBR. *See Tate*, at 1365 (citations omitted).

8     ## C.    PHARMASTEM WILL SUFFER IRREPARABLE HARM ABSENT A PRELIMINARY INJUNCTION.

9     The Federal Circuit has consistently and repeatedly held that patent infringement

10    gives rise to a presumption of irreparable harm:

11    "[I]t is well settled that, because the principal value of a patent is its statutory right
12    to exclude, the nature of the patent grant weighs against holding that monetary
      damages will always suffice to make the patentee whole.  The patent statute
13    provides injunctive relief to preserve the legal interest of the parties against future
      infringement which may have market effects never fully compensable in money.

14    *Hybritech*, 849 F.2d at 1456-57; *see also H.H. Robertson*, 820 F.2d at 390 ("This

15    presumption derives in part from the finite term of the patent grant, for patent expiration

16    is not suspended during litigation, and the passage of time can work irremediable harm.").

17    Accordingly, PharmaStem is entitled to a rebuttable presumption that it would be

18    irreparably harmed if preliminary injunction were not to issue, because it has established a

19    reasonable likelihood of success on the merits.  *See Bell & Howell Document Mgmt.*

20    *Prod. Co. v. Altek Sys.*, 132 F.3d 701, 705 (Fed. Cir. 1997); *see also Jack Guttman, Inc. v.*

21    *Kapykake Enterprises, Inc.*, 302 F.3d 1352, 1356 (Fed. Cir. 2002)(vacating and

22    remanding denial of preliminary injunction because "a clear showing of likelihood of

23    success on the merits entitles a patentee to a rebuttable presumption of irreparable harm").

24    Moreover, given the reasonable likelihood—demonstrated herein—of

25    PharmaStem ultimately prevailing in this lawsuit either at trial or as a matter of law,

26    without preliminary injunctive relief PharmaStem will have no way to recoup losses

27

28    PHARMASTEM'S MOTION FOR A PRELIMINARY
      INJUNCTION AGAINST CBR
      CASE NO. 04-3072 JSW                    23

1  stemming from the loss of market share that CBR obtains while infringing the Patents-In-

2  Suit.  PharmaStem currently has sixteen licensees who are in direct competition with

3  CBR.[42]  These licensee cord blood banks form the royalty base for PharmaStem's income

4  from its cord blood banking intellectual property.  Their loss of market share and

5  PharmaStem's loss of goodwill in the marketplace, if it cannot enforce its patent rights,

6  cannot be quantified in money damages and will be impossible to fully recover.

7      Finally, when the patent does not have many more years to run, the "equities

8  weigh heavily against the wrongdoer."  *H.H. Robertson*, at 391.  In this case, one of the

9  Patents-In-Suit expires in approximately three years, while even the most long-lived of

10  the Patents-In-Suit has only approximately five more years to run.  In the face of such

11  circumstances, courts have recognized that absent the ability to obtain injunctive relief

12  "the right to exclude granted by the patent would be diminished, and the express purpose

13  of the Constitution, to promote the progress of the useful arts, would be seriously

14  undermined.  The patent owner would lack much of the leverage, afforded by the right to

15  exclude, to enjoy the full value of his invention in the market place."  *Smith Int'l, Inc. v.*

16  *Hughes Tool Co.*, 718 F.2d 1573, 1578 (Fed. Cir. 1983).  "Without the right to obtain an

17  injunction, the patentees right to exclude would have only a fraction of the value it was

18  intended to have, and would no longer be as great an incentive to engage in the toils of

19  scientific and technological research."  *Id.*; *see also PPG Indus., Inc. v. Guardian Indus.*

20  *Corp.*, 75 F.3d 1558, 1566-67 (Fed. Cir. 1996)(affirming grant of preliminary injunction

21  based, in part, on finding that non-movant had not rebutted presumption of irreparable

22  harm in light of finding that movant's market position would be threatened in the absence

23  of injunctive relief).  Thus, absent preliminary injunctive relief CBR's infringing cord

24  blood banking activities will irreparably harm PharmaStem and its licensees and unjustly

25  diminish PharmaStem's patent rights.

26  _____

27  [42] *See* Kobialka Decl., Exh. 36.

28  PHARMASTEM'S MOTION FOR A PRELIMINARY
INJUNCTION AGAINST CBR
CASE NO. 04-3072 JSW                    24

1

2

**D.    THE BALANCE OF HARDSHIPS TIPS IN PHARMASTEM'S**
3        **FAVOR.**

4         The balance of hardships should be assessed on a sliding scale.  *H.H. Robertson*,

5    at 390.  To the extent that PharmaStem is able to make a strong showing of likelihood of

6    success on the merits, a lesser showing of hardship is required.  *Id.*  The reason for the

7    sliding scale is obvious.  "One who elects to build a business on a product found to

8    infringe cannot be heard to complain if an injunction against continuing infringement

9    destroys the business so elected."  *Windsurfing Int'l, Inc. v. AMF, Inc.*, 782 F.2d 995,

10   1003, n.12 (Fed. Cir. 1986).

11        Despite the lower bar for demonstrating hardship warranted by the strength of

12   PharmaStem's likelihood of infringement showing against CBR, PharmaStem is suffering

13   greater hardship than CBR by any measure.  As described above, PharmaStem faces

14   significant hardships, further multiplied by the hardships also suffered by its sixteen

15   licensees in direct competition with CBR, which will only be compounded absent a

16   preliminary injunction.  Moreover, under the terms of the proposed injunction, CBR's

17   hardship will be minimized.  Under the proposed injunction, CBR would still be able to

18   (1) continue to store its existing CBUs and (2) distribute its client's CBUs for

19   transplantation.  Thus, while PharmaStem is certainly not indemnifying CBR from any

20   damages it may owe to PharmaStem, by a rough estimate derived from CBR's own

21   publicized information, the proposed injunction will not stop CBR's current cash flow

22   from its annual storage fees of $95 per CBU[43] multiplied by the approximately 60,000

23   CBUs[44] it stores.  Such figures represent an annualized cash flow of approximately $5.7

24   million.  Even if CBR's actual annualized cash flow was only half of $5.7 million, it

25

26        [43] *See* Kobialka Decl., Exh. 37, at page 2.
        [44] *See* Kobialka Decl., Exh. 12, at page 2; *compare* Kobialka Decl., Exh. 11, at
27        page 2.

28

1   would still most likely be able to easily afford to pay its general, administrative, and

2   operating costs.  As a result, CBR will be unable to show any cognizable hardship greater

3   than PharmaStem's own arising from the proposed injunction.

4   **E.    THE PUBLIC INTEREST FAVORS AN INJUNCTION.**

5          **1.    The Proposed Injunction Presents No Medical Risk to the
                   Public.**

6

7          The present circumstances present no risk that the public interest will be adversely

8   affected by a preliminary injunction.  Not only are PharmaStem's sixteen existing

9   licensees ready, willing, and able to meet consumer cord blood banking demand, but

10  PharmaStem's proposed injunction ensures CBR's existing clients still have full access to

11  their cord blood units.  Through the proposed injunction, PharmaStem seeks only to

12  prevent CBR from enrolling new cord blood banking customers while this action is

13  pending.  Allowing CBR to use its dominant position in the private cord blood banking

14  market to continue to grow its very likely infringing business before this suit can be

15  finally adjudicated—or delaying until time runs out on the Patents-In-Suit altogether, will

16  unduly prejudice and cause PharmaStem and its sixteen licensees irreparable harm.

17  Moreover, the public will also be robbed of the benefits of increased competition in the

18  cord blood banking marketplace.

19         **2.    The Public Interest is Best Served when Pioneering Patents are
                   Upheld.**

20

21         The public interest is also best served when valid patent rights are upheld and

22  enforced.  *See Illinois Tool Works, Inc. v. Grip-Pak, Inc.*, 906 F.2d 679 (Fed. Cir. 1990);

23  *see also Smith*, at 1581 ("public policy favors protection of the rights secured by valid

24  patents"); *Richardson v. Suzuki Motor Co., Ltd.*, 868 F.2d 1226, 1246-47 (Fed. Cir.

25  1989)("it is contrary to the laws of property, of which the patent law partakes, to deny the

26  patentee's right to exclude others from use of his property").  Indeed, the Patents-In-Suit

27

28  PHARMASTEM'S MOTION FOR A PRELIMINARY
    INJUNCTION AGAINST CBR
    CASE NO. 04-3072 JSW                 26

1  present an especially compelling case for enforcement, as they have indisputably

2  endowed the medical and scientific arts with a completely new and original, life-saving,

3  medical technology.

4

        **3.      Public Confusion will be Dispelled by Compelling CBR to take
5               Consistent Positions in Litigation and in the Marketplace.**

6      Lastly, PharmaStem also requests, as long as CBR attempts to balance between

7  neither confirming nor disavowing its CBUs' sufficiency for adult use, that it be enjoined

8  from promoting its cord blood banking services for potential adult use.  Either a

9  disclaimer of potential adult usage, or admission here in Court, will go a long way to

10 clarifying for the consuming public CBR's inconsistent positions with respect to whether

11 or not its CBUs contain stem cells in an amount sufficient to effect hematopoietic

12 reconstitution of a human adult, as advertised and, indeed, as guaranteed.  The public

13 interest, and medical ethics, demand no less.  As PharmaStem has shown herein, there

14 really is no serious question that the scientific and medical consensus strongly supports

15 cord blood transplantation as an option for both pediatric and adult patient need.

16 Therefore, for all of the above reasons, the public interest would be best served by the

17 entry of the proposed preliminary injunction against CBR.

18                    **V.      CONCLUSION**

19     For all of the above reasons, PharmaStem respectfully submits that it is entitled to

20 the entry of a preliminary injunction against CBR in substantially the same form as the

21 Proposed Preliminary Injunction filed herewith, and for what further and other relief the

22 Court may deem proper or just.

23 DATED: January 5, 2005                **PERKINS COIE LLP**

24

25                              By _____/s/_____
                                      Paul J. Andre, Esq.
26                                   Attorneys for
                                   PharmaStem Therapeutics, Inc.
27

28 PHARMASTEM'S MOTION FOR A PRELIMINARY
   INJUNCTION AGAINST CBR
   CASE NO. 04-3072 JSW          27