# POTTER ANDERSON & CORROON LLP

1313 NORTH MARKET STREET
P.O. BOX 951
WILMINGTON, DELAWARE 19899-0951

302 984-6000
302 658-1192 FAX
www.potteranderson.com

Philip A. Rovner
302 984-6140
provner@potteranderson.com

July 2, 2004

**BY HAND DELIVERY**

The Honorable Gregory M. Sleet
United States District Court
  for the District of Delaware
U.S. Courthouse
844 King Street
Wilmington, Delaware 19801

Re:    PharmaStem Therapeutics, Inc. v. ViaCell, Inc. et al.,
       D.Del., C.A. No. 02-148-GMS

Dear Judge Sleet:

      We write in response to the defendants' joint motion for a temporary restraining order and injunctive relief, and the accompanying motion for expedited briefing schedule, copies of which we received late in the afternoon on Wednesday, June 30, 2004.

      As this Court is aware, and as even defendants grudgingly admit, in October 2003, a jury empanelled by this Court, returned a verdict in favor of plaintiff PharmaStem Therapeutics, Inc. ("PharmaStem") and against defendants (the "Delaware Action"). Pursuant to that verdict, all defendants were found liable for willful infringement of two of PharmaStem's patents -- the '681 patent and the '553 patent – relating to the collection, storage and cryopreservation of cord blood.[1] Additionally, both patents were found to be valid and enforceable. This Court immediately entered judgment on that verdict on October 30, 2003. Notwithstanding the jury's unambiguous verdict -- and the Court's subsequent entry of judgment on that verdict -- defendants inexplicably seek injunctive relief, asking that PharmaStem be prohibited from communicating with the obstetrician community at large regarding its own patent portfolio, including the two patents-at-issue that defendants were found to infringe in October 2003. As

---

[1] Curiously, defendants neglected to mention that their infringement was determined to be willful.

EXHIBIT B

The Honorable Gregory M. Sleet
July 2, 2004
Page 2

shown below, by seeking to enforce its rights and those of its licensees, PharmaStem has done nothing wrong. Defendants' motion therefore should be denied.

The object of defendants' ire -- and the subject of their request for immediate injunctive relief -- is a June 1, 2004 letter from PharmaStem's President and CEO, Nicholas Didier, to a number of obstetricians. A copy of the June 1 letter is attached as Exhibit A to defendants' Memorandum in Support of their Motion ("Defs.' Memo."). In that letter, which Mr. Didier wrote in response to various obstetricians' expressed concerns regarding the implications to them relating to their collection of umbilical cord blood, PharmaStem did exactly what it is entitled to do with respect to the enforcement of its patents: It set forth PharmaStem's position regarding obstetricians' potential liability to PharmaStem for patent infringement should they deal with unlicensed cord blood banks. Indeed, the letter that defendants contend mischaracterizes what occurred in this Court specifically identifies five separate PharmaStem patents, only two of which even were at issue in the Delaware Action.

That defendants are not pleased by the fact that this Court's jury found two of PharmaStem's patents valid and enforceable and returned a finding of willful infringement against them is not surprising. What is surprising is that defendants apparently believe they can keep that information from the obstetrician community. Simply stated, defendants are not entitled to stop PharmaStem from providing notice to obstetricians as to which private cord blood banks have taken a license from PharmaStem and which of those have not. Indeed, to date nearly all the private cord blood banks in the United States have taken licenses to PharmaStem's patents.[2]

Defendants clearly have been hurt by the competition from licensed cord blood banks. They admit as much. However, because defendants lack standing to respond directly to PharmaStem's letter, which PharmaStem wrote to *obstetricians* regarding *obstetricians'* potential liability to PharmaStem, defendants have attempted to stop PharmaStem from enforcing its patents by a different route. In their motion papers, defendants assert that PharmaStem's June 1 letter contains false statements and that those false statements have raised a concern among obstetricians about "potential liability for patent infringement if they merely collect cord blood…." (Defs.' Memo at 3). According to defendants, "many obstetricians are now *refusing* to collect cord blood for purposes of blood banking, pending the outcome of this litigation." *Id.* (emphasis in original). The basis for defendants' extraordinary request -- an immediate restraining order -- is that, according to defendants, "both the public and Defendants will be irreparably harmed without it." Defendants further contend that the requested injunction is in the public interest, which is served by "keeping lifesaving medical technology available to the public." *Id.* at 11.

_____

[2] As of this date, of the 20 known private cord blood banks, 15 have taken a license; one other is about to do so. Thus, only the four defendants remain unwilling to take a license.

The Honorable Gregory M. Sleet
July 2, 2004
Page 3

Defendants' request, along with their attempt to expedite briefing on their motion, should be denied for the simple reason that PharmaStem has never threatened to keep lifesaving medical technology from the public. By contrast, in its letter, PharmaStem clearly stated that no obstetrician would be subjected to any claim of infringement, contributory or otherwise, so long as the obstetrician collects cord blood for a blood bank licensed by PharmaStem. To further clarify its position, PharmaStem's letter identified those private cord blood banks (the vast majority of all known private cord blood banks in the industry), that have taken a license from PharmaStem and that are available to each and every potential cord blood donor.

Because there is no threat to the public at large, defendants have manufactured a second argument. That contention, based on dissecting the language PharmaStem elected to use in its letter to describe what occurred in this Court, should similarly be disregarded. Specifically, defendants take exception to the following two sentences found in the second paragraph of the June 1 letter:

> Patent infringement occurs when a person or institution practices all or part of a patented process. In the case of umbilical cord blood collection by an Obstetrician, the Court ruled that infringement occurs even if the cryopreservation and storage is performed by a third party.

Whether this Court's judgment (which it issued immediately after the jury returned its verdict) constitutes a "ruling" is insignificant. What is significant is that the jury found for PharmaStem and against each defendant, in response to Special Interrogatory No. 5 which read:

> Has PharmaStem proven that a Defendant has contributorily infringed the '553 patent by selling or offering to sell cryopreserved cord blood that was actually used by a third party in the direct infringement of any claims, 13, 19, 47, 53, or 57 of the '553 patent?

The jury's finding in PharmaStem's favor in response to Special Interrogatory No. 5 was the message Mr. Didier intended to convey in his June 1 letter. Defendants know that. Indeed, had defendants chosen to be fully forthcoming rather than simply anxious to taint PharmaStem in the eyes of this Court while post-trial motions are pending, defendants would have not omitted the fact that, in the very same letter, PharmaStem stated that "[A]n injunction [should one be granted] would prevent the *infringing companies* from continuing their cord blood storage activities." June 1, 2004 letter (emphasis added). That sentence makes it clear that, in PharmaStem's view, the jury's verdict was directed at the infringing defendants, not at obstetricians.

Defendants are unhappy with the jury's verdict and where that has left them in the marketplace. That is a problem of defendants' own making. As PharmaStem will address more fully in its formal opposition to defendants' motion for a temporary restraining order and injunctive relief, should the Court require formal briefing, the four defendants represent but a small number of the operating private blood banks. Virtually every private cord blood bank in

The Honorable Gregory M. Sleet
July 2, 2004
Page 4

the United States has taken a license from PharmaStem. That obviously has placed the defendants in the precarious position of being virtually the only private cord blood banks operating without a license. However, that defendants, all of which have been found to have willfully infringed two of PharmaStem's patents (the only patents-in-suit in Delaware), have been economically harmed is not PharmaStem's concern. And it should not serve to prohibit PharmaStem from enforcing its patents (and the rights of its licensees arising from those patents) as it sees fit.

Accordingly, PharmaStem respectfully requests that defendants' motion for injunctive relief be denied. If the Court is not inclined to deny defendants' motion at this time, PharmaStem respectfully requests that, because defendants have not shown even a threat of irreparable harm to the public at large (because of the large number of licensed private banks available for cord blood storage and cryopreservation), briefing take place pursuant to Rule 7.1.2. of this Court's Local Rules.

Should Your Honor have any questions, counsel is available at the Court's convenience.

Respectfully,

Philip A. Rovner

PAR/mes/641096
Encls.
cc: Clerk of the Court – by hand delivery
    Richard D. Kirk, Esq. - by hand delivery
    Robert F. Stewart, Esq. – by hand delivery
    Jeffrey L. Moyer, Esq. – by hand delivery
    William F. Abrams, Esq. – by facsimile
    James J. Rodgers, Esq. – by facsimile
    Paul F. Ware, Jr., Esq. – by facsimile

FILED
CLERK U.S. DISTRICT COURT
DISTRICT OF DELAWARE

**IN THE UNITED STATES DISTRICT COURT**

2004 JUL -7  PM 4: 07

**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| PHARMASTEM THERAPEUTICS, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 02-148-GMS |
| | ) | |
| VIACELL, INC., CRYO-CELL | ) | |
| INTERNATIONAL, INC., CORCELL, INC., | ) | |
| STEMCYTE, INC., CBR SYSTEMS, INC. | ) | |
| f/k/a CORD BLOOD REGISTRY, INC., | ) | |
| BIRTHCELLS TECHNOLOGY, INC., | ) | |
| NUSTEM TECHNOLOGIES, INC., and | ) | |
| BIO-CELL, INC., | ) | |
| | ) | |
| Defendants. | ) | |

**PHARMASTEM THERAPEUTICS, INC.'S OPPOSITION TO
VIACELL, INC.'S, CRYO-CELL INTERNATIONAL, INC.'S,
CORCELL, INC.'S, AND CBR SYSTEMS, INC.'S JOINT MOTION
FOR TEMPORARY RESTRAINING ORDER AND INJUNCTIVE
RELIEF AND MOTION TO DISSOLVE THIS COURT'S ORDER
OF THE PRELIMINARY INJUNCTION**

OF COUNSEL:                         Philip A. Rovner (#3215)
Paul J. André                       POTTER ANDERSON & CORROON LLP
Lisa Kobialka                       Hercules Plaza
Perkins Coie LLP                    P.O. Box 951
101 Jefferson Drive                 Wilmington, DE  19899
Menlo Park, CA 94025                (302) 984-6000
(650) 838-4300
                                    Attorneys for Plaintiff
Dated: July 7, 2004                 PharmaStem Therapeutics, Inc.

# TABLE OF CONTENTS

NATURE AND STAGE OF THE PROCEEDINGS ................................................................. 1

PRELIMINARY STATEMENT ......................................................................................... 2

SUMMARY OF ARGUMENT .......................................................................................... 3

APPLICABLE LEGAL STANDARDS .............................................................................. 4

     A.    Legal Standard for Preliminary Injunctive Relief ................................................. 4

STATEMENT OF FACTS ................................................................................................ 5

ARGUMENT        .................................................................................................. 5

I.    Defendants Do Not Have Standing to Request Injunctive Relief
From PharmaStem's Communications with Obstetricians ............................................ 5

     A.    Defendants Have Misled This Court Into Bypassing the
Traditional Test for Preliminary Injunctions Altogether
By Putting Forth a Vague Theory for the Extension of the
All Writs Act That is Unsupported by the Law ................................................ 7

          1.    The All Writs Act Does Not Confer Upon Defendants
The Requisite Standing to Pursue Injunctive Relief ................................ 8

     B.    Defendants Have Not Shown the Existence of a "Case or
Controversy" Upon Which Injunctive Relief May Be Granted ......................... 11

     C.    Defendants Are Not Entitled To Equitable Relief of an Injunction,
Because They Have Unclean Hands ................................................................. 11

II.    Defendants Are Not Entitled to Injunctive Relief Because They Cannot Show A
Reasonable Likelihood of Success on the Merits, Irreparable Harm in the Absence
of a Preliminary Injunction, a Balance of Hardships Tipping in Their Favor, and
the Injunction's Favorable Impact on the Public Interest ............................................ 12

     A.    Defendants Have Not Shown Any Likelihood of Success
On the Merits ................................................................................................. 12

     B.    Defendants Have Not Shown Any Harm or Threat of Harm
To the Public in the Absence of a Preliminary Injunction ................................ 13

C.    Defendants Have Not Shown That The Balance of Hardships
      Tips in Their Favor ........................................................................................ 14

D.    Defendants Have Not Shown that the Injunction Will Have A
      Favorable Impact on the Public Interest ............................................. 14

III.    PharmaStem's Actions Were Proper Under the Law and Should Not Be
        Preliminarily Enjoined ............................................................................................ 15

A.    PharmaStem Has The Legal Right to Contact Obstetricians
      Regarding Its Patents ............................................................................. 15

B.    The PharmaStem Letter Did Not Contain False or Misleading
      Statements Regarding Defendants or The Delaware Action ............................. 17

C.    The PharmaStem Letter Did Not Contain False or Misleading
      Statements Regarding The Law ........................................................................... 19

      1.    The Court's Preliminary Injunction Is Untenable .................................. 21

CONCLUSION        ........................................................................................................ 26

# TABLE OF AUTHORITIES

## CASES

*Allen Organ Co. v. Kimball International, Inc.,*
   839 F.2d 1556 (Fed. Cir. 1988)............................................................23

*Amazon.com, Inc. v. Barnesandnoble.com, Inc.,*
   239 F.3d 1343 (Fed. Cir. 2001)..............................................................4

*Anderson v. Cryovac, Inc.,*
   862 F.2d 910 (1st Cir. 1988)................................................................23

*In re Arthur Treacher's Franchise Litigation,*
   689 F.2d 1150 (3rd Cir. 1982).................................................................6

*Baker Perkins, Inc. v. Werner & Pfleiderer Corp.,*
   710 F.2d 1561 (Fed. Cir. 1983)............................................................10

*C.R. Bard, Inc. v. M3 System, Inc.,*
   157 F. 3d 1340 (Fed. Cir. 1998).............................................................16

*Carlough v. Amchem Products, Inc.,*
   10 F.3d 189 (3rd Cir. 1993).....................................................................9

*Concrete Unlimited, Inc. v. Cementcraft, Inc.,*
   776 F.2d 1537 (Fed. Cir. 1985).............................................................15

*Cordis Corp. v. Medtronic, Inc.,*
   194 F. Supp. 2d 323 (D. Del. 2002).......................................................24

*Crowell v. Baker Oil Tools, Inc.,*
   143 F.2d 1003 (9th Cir. 1944)...............................................................24

*Dawson Chemical Co. v. Rohm and Haas Co.,*
   448 U.S. 176 (1980)...............................................................................25

*In re Diet Drugs,*
   282 F.3d 220 (3rd Cir. 2002)....................................................................9

*Doe v. National Board of Medical Examiners,*
   199 F.3d 146 (3rd Cir. 1999)..................................................................11

*E.I. DuPont De Nemours and Co. v. Monsanto Co.,*
   903 F. Supp. 680 (D. Del. 1995), *aff'd,* 92 F.3d 1209 (Fed. Cir.
   1996) (Table)........................................................................................24

*Florida Medical Association, Inc. v. U.S. Department of Health, Ed. And Welfare,*
    601 F.2d 199 (5th Cir. 1979) ................................................................10

*Golan v. Pingel Enterprise, Inc.,*
    310 F.3d 1360 (Fed. Cir. 2002)..............................................15, 16, 17

*Granny Goose Foods, Inc. v. Brotherhood of Teamsters & Automobile Truck Drivers,*
    415 U.S. 423 (1974)................................................................................6

*Gurley v. Superior Court of Mecklenburg County,*
    411 F.2d 586 (4th Cir. 1969) ...............................................................10

*Hewlett Packard Co. v. Bausch & Lomb Inc.,*
    909 F.2d 1464 (Fed. Cir. 1990)............................................................25

*Hoechst Celanese Corp. v. BP Chemicals, Ltd.,*
    78 F.3d 1575 (Fed. Cir. 1996).............................................................23

*Hunter Douglas, Inc. v. Home Design, Inc.,*
    153 F.3d 1318 (Fed. Cir. 1998)............................................................15

*Intel Corp. v. ULSI System Tech., Inc.,*
    995 F.2d 1566 (Fed. Cir. 1993).............................................................4

*Jack Guttamn, Inc. v. Kopykake Enterprises, Inc.,*
    302 F. 3d 1352 (Fed. Cir. 2002)...........................................................4

*Joy Technologies, Inc. v. Flakt, Inc.,*
    6 F.3d 770 (Fed. Cir. 1993)................................................................24

*Lujan v. Defenders of Wildlife,*
    504 U.S. 555 (1992)............................................................................11

*Metal Film Co. v. Metlon Corp.,*
    316 F. Supp. 96 (S.D.N.Y 1970) .........................................................24

*Mikohn Gaming Corp. v. Acres Gaming, Inc.,*
    165 F.3d 891 (Fed. Cir. 1998)......................................................15, 16

*Mitsubishi Electric Corp. v. Ampex Corp.,*
    190 F.3d 1300 (Fed. Cir. 1999)............................................................23

Defendants' Motion is a Trojan Horse, meant to appear as a gift to the Court, purportedly submitted to protect the Court's processes, but in reality seeks Defendants' own profit. Incredibly, Defendants seek to clear the path to further profit from their continuing infringement of PharmaStem's patents and enlists the Court's help in doing so. Defendants' Motion asks the Court to abandon the judicial safeguards of due process of law and the traditional tests for injunctive relief.

## SUMMARY OF ARGUMENT

Defendants' request for a preliminary injunction should be denied because Defendants, all of which have been found to have willfully infringed two of PharmaStem's patents, do not have standing to bring a motion for injunctive relief based on the PharmaStem Letter sent to *obstetricians* regarding *obstetricians'* potential liability to PharmaStem. The law places the burden on patent holders to notify potential infringers of the existence of patents that might be infringed by such third parties. PharmaStem should not be enjoined from exercising its most basic patent right of enforcing its patents, including those not in suit in the Delaware Action, and notifying parities regarding PharmaStem's patents. Defendants' request for a preliminary injunction should also be denied because Defendants have also failed to demonstrate the four factors required for a preliminary injunction: (i) a reasonable likelihood of success on the merits, (ii) irreparable harm in the absence of a preliminary injunction, (iii) a balance of hardships tipping in its favor, and (iv) the injunction's favorable impact on the public interest. Furthermore, Defendants' assertion that the PharmaStem Letter contains false and misleading statements about the potential liability of obstetricians and the law of contributory infringement fails since PharmaStem's statements are accurate, and to the extent any inaccuracies exist, such statements were not intentionally meant to be inaccurate or made in bad faith by PharmaStem. In addition, because of the large number of licensed private banks available for cord blood storage and cryopreservation there is

and PharmaStem's request for a permanent injunction." Defendants' Motion at 7. Defendants explicitly argue that the All Writs Act conferred upon the Court the "power to protect its own processes by preventing conduct which undermines or negates those processes." Defendants' Motion at 7. Thus, Defendants' only argument is that its Motion is designed to protect *the Court's* rights and processes. Despite Defendants' purported altruism, however, neither statute nor case law supports Defendants' attempts to gerrymander the All Writs Act into authorizing the injunctive relief sought by Defendants. As demonstrated below, the All Writs Act abrogates neither the procedural requirements of Fed. R. Civ. P. 65, nor the substantive requirement that Defendants must have a legally cognizable right to the injunctive relief requested.

Here, Defendants have not identified any impingement of their legal rights whatsoever. They have asserted the rights of the public and those of the judiciary, but not their own. The reason behind such a conspicuous absence is equally clear: Defendants have been found to willfully infringe PharmaStem's patents-in-suit and cannot hope to derive further benefit from further infringement. Yet, this is exactly what they request the Court to allow them to do, that is, to allow them to further enlarge their coffers by permitting them to engage in new infringements of PharmaStem's patents, while they benefit from a royalty rate--pending the final disposition of litigation—at a discount of less than half of the current market rate for an authorized license.

1. **The All Writs Act does not confer upon Defendants the requisite standing to pursue injunctive relief.**

Although Defendants' arguments are deliberately vague and full of gaping analytical chasms, by the process of elimination, their only possible basis for standing and jurisdiction appears to be grounded in their reliance on the All Writs Act. All other grounds for standing or jurisdiction are simply missing from Defendants' motion. Thus, PharmaStem must proceed as if Defendants are relying solely on the "power to protect its

own processes by preventing conduct which undermines or negates those processes" purportedly conferred upon the Court by the All Writs Act.

In relevant part, the All Writs Act states only that, "The Supreme Court and all courts established by Act of Congress may issue all writs necessary or appropriate *in aid of their respective jurisdictions* and agreeable to the usages and principles of law." See 28 U.S.C. § 1651 (emphasis added). Even the cases cited by Defendants demonstrate that the All Writs Act's provisions, though flexible, are limited in scope to writs necessary and appropriate to "effectuate and to prevent the frustration of orders it has previously issued in its *exercise of jurisdiction otherwise obtained*," *U.S. v. Mason Tenders Dist. Council of Greater New York*, 205 F. Supp. 2d 183, 188-90 (S.D.N.Y. 2002)(emphasis added), or to "enjoin state court proceedings in order to protect *its jurisdiction*," *In re Diet Drugs*, 282 F.3d 220, 234-35 (3rd Cir. 2002)(emphasis added); *Carlough v. Amchem Products, Inc.*, 10 F.3d 189, 202-04 (3rd Cir. 1993)(same). Thus, justification for the type of federal judicial intervention authorized by the All Writs Act lies primarily in the interests of protecting exclusive federal jurisdiction of cases removed from state courts or wherever "the exercise by the state court of jurisdiction over the same res necessarily impairs, and may defeat, the jurisdiction of the federal court already attached." *See Diet Drugs*, 282 F.3d at 234-35.

As the Supreme Court stated, in *Pennsylvania Bureau of Correction v. U.S. Marshals Service*, "[o]ur early view of the scope of the all writs provision confined it to filling the interstices of federal judicial power when those gaps threatened to thwart the otherwise proper exercise of federal courts' jurisdiction." 474 U.S. 34, 41 (1985)(citations omitted). Moreover, in construing the legislative history behind the All Writs Act, the Supreme Court expressly held that "the 1948 changes in phraseology do not mark a congressional expansion of the powers of federal courts to authorize issuance of any 'appropriate' writ." *Penn. Bureau of Correction*, 474 U.S. at 42. On the foregoing bases, the Supreme Court further expressly held that "[t]he All Writs Act is a residual

9

source of authority to issue writs that are not otherwise covered by statute." *Id.* at 43. "Where a statute specifically addresses the particular issue at hand, it is that authority, and not the All Writs Act, that is controlling... [a]lthough that Act empowers federal courts to fashion extraordinary remedies when the need arises, it does not authorize them to issue ad hoc writs whenever compliance with statutory procedures appears inconvenient or less appropriate." *Id.*; *see also Gurley v. Superior Court of Mecklenburg County*, 411 F.2d 586, 587 (4th Cir. 1969)("The authority of federal courts to issue extraordinary writs derives from the 'all writs statute,' 28 U.S.C. § 1651... [t]his authority, however, exists for the sole purpose of protecting the respective jurisdictions of those courts.")

Hence, it is black letter law that "[t]he All Writs Act is not an independent basis of jurisdiction, and the petitioner must initially show that the action sought to be corrected by mandamus is within this court's statutorily defined subject matter jurisdiction." *Baker Perkins, Inc. v. Werner & Pfleiderer Corp.*, 710 F.2d 1561, 1565 (Fed. Cir. 1983)(citations omitted). Here, the Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1338(a), because the action arose under the Patent Act, 35 U.S.C. §§ 271 *et seq.* But, Defendants' current grievance does not appear to confer upon it the same subject matter jurisdiction. "[T]he All Writs Act [does not] confer on the courts the power to ignore the case or controversy requirement, which is rooted in Article III of the constitution's definition of judicial power." *U.S. v. City of New York*, 972 F.2d 464, 470 (2nd Cir. 1992). Specifically, "[t]his section does not free a district court from the restraints of [Fed. R. Civ. P. 65], which covers temporary restraining orders and preliminary injunctions." *Florida Medical Ass'n, Inc. v. U.S. Dept. of Health, Ed. and Welfare*, 601 F.2d 199 (5th Cir. 1979). Thus, Defendants' sole reliance on the All Writs Act is inapposite.

10

**B.    Defendants Have Not Shown the Existence of a "Case or Controversy" Upon Which Injunctive Relief May Be Granted.**

Constitutional standing is a necessary element of any claim for injunctive relief. This requires Defendants to show injury in fact to themselves, causation, and redressability. *See* U.S. Const., Art. III; *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992); *Doe v. National Bd. of Med. Examiners*, 199 F.3d 146, 152-53 (3rd Cir. 1999). This, Defendants have not addressed, much less shown. Indeed, Defendants' reluctance to argue third-party standing on their own behalf, the only type of standing they could even colorably claim, only underscores the lack of substance and merit behind their request for injunctive relief.

**C.    Defendants Are Not Entitled to Equitable Relief of an Injunction, Because They Have Unclean Hands.**

Moreover, a federal court may only issue an injunction in any case within its subject matter jurisdiction that is ***appropriate*** for equitable relief. *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 311-12 (1982)(emphasis added). Aside from the question of subject matter jurisdiction, this Court should not grant Defendants equitable relief, because they have unclean hands and must do equity to have equity. Here, Defendants were found, by the jury, to be willfully infringing PharmaStem's patents-in-suit. Yet, clearly, Defendants, by and through their motion for injunctive relief, seek to enable themselves to continue to willfully infringe PharmaStem's patents-in-suit and continue to benefit from such willful infringement. Because the purpose of injunctive relief is to preserve the *status quo* pending final determination on the merits, at the very least, the Court should consider Defendants' request for injunctive relief only upon the condition that they cease all cord blood collection pending final disposition of this litigation. This, they have not offered to do. The upshot of the proposed injunction against PharmaStem is a prior restraint of free speech, an undue restraint on trade, an grant of financial reward to Defendants for their continuing willful infringement of PharmaStem's patents. Such a manipulation of justice hardly seems fair or equitable.

11

**II.    Defendants Are Not Entitled to Injunctive Relief Because They Cannot Show A Reasonable Likelihood of Success on the Merits, Irreparable Harm in the Absence of a Preliminary Injunction, a Balance of Hardships Tipping in Their Favor, and the Injunction's Favorable Impact on the Public Interest.**

**A.    Defendants Have Not Shown Any Likelihood of Success on the Merits.**

Defendants' request should be denied because they fail to establish that they have a reasonable likelihood of success on the merits of a claim as they fail to allege *any* claim or cause of action whatsoever.  Nowhere in Defendants' Motion is the likelihood of success factor discussed, nor is there any cause of action alleged.  As shown above, "a movant is *not entitled to a preliminary injunction* if he fails to demonstrate a likelihood of success on the merits…[and] a district court cannot use an exceptionally weighty showing on one of the other three factors to grant a preliminary injunction if a movant fails to demonstrate a likelihood of success on the merits." *National Steel at* 1324-1325.  Defendants are not entitled to injunctive relief because there are no legal claims raised in Defendants' Motion, and they have therefore failed to establish, or even argue, that they have a reasonable likelihood of success with regards to the merits of any claims.

Of course, it is impossible for PharmaStem to know what, if any, cause of action Defendants assert against PharmaStem.  Perhaps Defendants have conceived of a random state court cause of action, which they do not allege in their motion, and thus obviously fail to discuss the likelihood of success of the merits.  Or perhaps Defendants are seeking preliminary injunctive relief pending the Court's decision on one or many of the post-trial motions, but do not believe that they can argue in good faith that they expect the Court to upset the jury verdict or adopt a reversal of law regarding patent infringement, *i.e.,* the contributory infringement of method patents.  Indeed, Defendants have not alleged nor briefed this position in their motion, and thus have made no demonstration of a likelihood of success on the merits as required under the law.

12

**B.    Defendants Have Not Shown Any Harm or Threat of Harm to the Public in the Absence of a Preliminary Injunction.**

Defendants' request should also be denied because they have not shown that there would be any harm to the public absent the preliminary injunction.  Contrary to Defendants' assertion, PharmaStem has never threatened to keep lifesaving medical technology from the public.  Instead, the PharmaStem Letter clearly states that no obstetrician would be subjected to any claim of infringement, contributory or otherwise, so long as the obstetrician collects cord blood for a blood bank licensed by PharmaStem, and identifies those private cord blood banks (the vast majority of all known private cord blood banks in the industry), that have taken a license from PharmaStem and that are available to each and every potential cord blood donor.  PharmaStem's communication to obstetricians of these facts does not harm the public and should not be enjoined.

Furthermore, PharmaStem has licensed, and continues to license, its patent portfolio. Exh. 3 (List of Licensees from PharmaStem's Website) and Exh. 4 (Press Releases Announcing Licensing Agreements).  Currently, of the 20 known private cord blood banks, 15 have taken a license to PharmaStem's patents and one other is about to do so.  Thus, only the four defendants remain unwilling to take a license.[6]  Because there are numerous cord blood banks licensed to collect, cryopreserve, and store umbilical cord blood stem cells for future therapeutic use, these licensees are capable of meeting any public need for the invention and there is absolutely no harm tot he public.

To the extent Defendants argue that they are suffering commercial harm, such harm is not relevant here.  Of course, Defendants are unhappy with the jury's verdict and where that has left them in the marketplace.  But that is a problem of Defendants' own

---

[6] The rights of PharmaStem's existing licensees must also be considered.  It makes no sense to maintain a fractured and inefficient marketplace where some who are practicing PharmaStem's patented inventions are bound by a license while others are not.  By allowing the continual infringement by Defendants both PharmaStem and its licensees are being robbed of the benefit of their bargain should PharmaStem be unable to prevent unauthorized competitors from participating in the marketplace.

patent, would be to thwart the public's interest in upholding federal patent laws. Thus, granting the proposed preliminary injunction can only result in an unfavorable impact on the public interest, rather than the favorable impact as required under the law.

### III.   PharmaStem's Actions Were Proper Under the Law and Should Not Be Preliminarily Enjoined.

#### A.   PharmaStem Has The Legal Right to Contact Obstetricians Regarding Its Patents.

PharmaStem has the legal right and obligation to contact the obstetricians regarding their potential infringement of PharmaStem's patents, and cannot be held liable for doing so unless Defendants demonstrate that PharmaStem acted in bad faith. *Golan v. Pingel Enterprise, Inc.*, 310 F.3d 1360, 1370-1371 (Fed. Cir. 2002)("federal patent law bars the imposition of liability [under federal or state law] for publicizing a patent in the marketplace unless the plaintiff can show that the patent holder acted in bad faith."), *quoting Zenith Elecs. Corp v. Exzec, Inc.*, 182 F. 3d 1340, 1353 (Fed. Cir. 1999); *see also Hunter Douglas, Inc. v. Home Design, Inc.*, 153 F. 3d 1318, 1336 (Fed. Cir. 1998); *Concrete Unlimited, Inc. v. Cementcraft, Inc.*, 776 F. 2d 1537, 1538 (Fed. Cir. 1985)("a patent owner has the right to enforce its patent, and that includes threatening alleged infringers with suit.")

In *Mikohn Gaming Corp. v. Acres Gaming, Inc.*, the Federal Court articulated a federal standard applicable to all torts, state or federal, based on a patentee's statements about patent infringement to a potential infringer and the industry. 165 F. 3d 891, 897 (Fed. Cir. 1998). The Court explained that

> communication to possible infringers concerning patent
> rights is not improper if the patent holder has a good faith
> belief in the accuracy of the communication. Although
> "bad faith" may encompass subjective as well as objective
> considerations, and the patent holder's notice is not
> irrelevant to a determination of bad faith, a competitive
> commercial purpose is not of itself improper, and bad faith

15

is not supported when the information is objectively
accurate. In general, a threshold showing of incorrectness
or falsity, or disregard for either, is required in order to find
bad faith in the communication of information about the
existence or pendency of patent rights. Indeed, a patentee,
acting in good faith on its belief as to the nature and scope
of its rights, is fully permitted to press those rights even
though he may misconceive what those rights are.

*Id.*

Moreover, the law recognizes a presumption that the assertion of a duly granted

patent is made in good faith, and that this presumption is overcome only by affirmative

evidence of bad faith. *Golan* at 1371, *citing C.R. Bard, Inc. v. M3 Sys., Inc.*, 157 F. 3d

1340 (Fed. Cir. 1998); *see also Virtue v. Creamery Package Mfg. Co.*, 227 U.S. 8

(1913).[7] PharmaStem is thus "allowed to make representations that turn out to be

inaccurate provided they make them in good faith," and in any challenge to the

statements made in the PharmaStem Letter, the challenging party must present "clear and

convincing evidence that the infringement allegations are objectively false, and that the

patentee made them in bad faith, *viz.*, with knowledge of their incorrectness or falsity, or

disregard for either, the statements are actionable and are not protected by the existence

of a patent." *Golan* at 1371, *citing Mallinckrodt, Inc. v. Medipart, Inc.*, 976 F. 2d 700,

710 (Fed. Cir. 1992).

Therefore, to the extent that the PharmaStem Letter contained any inaccuracies or

misconceptions by Mr. Didier regarding PharmaStem's patents, the outcome of the

Delaware Action, or the infringement of the patents, PharmaStem is not liable unless

---

[7] In *Zenith Electronics*, the Federal Circuit explained that the law regarding proof of bad
faith is case-specific, but that in certain cases, bad faith may be clear: "Exactly what
constitutes bad faith remains to be determined on a case by case basis. Obviously, if the
patentee knows that the patent is invalid, unenforceable, or not infringed, yet represents
to the marketplace that a competitor is infringing the patent, a clear case of bad faith
representation is made out." *Zenith* at 1354. Here, there is no such evidence, and
Defendants have failed to provide to the Court clear and convincing evidence from which
a reasonable jury could conclude that the PharmaStem Letter alleges patent infringement in bad
faith.

such inaccuracies were made in bad faith. *Golan* at 1371. In fact, Defendants have not even alleged, nor is there any factual basis for any such allegations, that PharmaStem acted in bad faith in sending the PharmaStem Letter to obstetricians. *See* Defendants' Motion. Because the assertions contained in the PharmaStem Letter were not false nor made in bad faith, they should not be enjoined by this Court. *Golan* at 1371 (A patentee "acting in good faith on its belief as to the nature and scope of its rights, is fully permitted to press those rights even though he may misconceive what those rights are.")

**B.    The PharmaStem Letter Did Not Contain False Or Misleading Statements Regarding Defendants or The Delaware Action.**

Mr. Didier, the CEO and President of PharmaStem, and the individual who drafted the PharmaStem Letter, did not knowingly include any false or misleading statements in the letter regarding Defendants or the Delaware Action. Instead, Mr. Didier, who sat in the Courtroom throughout the entire three week trial in the Delaware Action, drafted the PharmaStem Letter in good faith to notify obstetricians of the PharmaStem patents. Indeed, the PharmaStem Letter refers to *five* PharmaStem patents,[8] three of which were not litigated in the Delaware Action, and which Mr. Didier understands Defendants may also infringe. Also, the PharmaStem Letter was drafted for the purpose of responding to various inquires from obstetricians regarding PharmaStem's patents.

By selectively taking the language used in the PharmaStem Letter to describe what occurred in this Court out of context, Defendants now attempt to show that the PharmaStem Letter is misleading, pouncing on the following two sentences:

> Patent infringement occurs when a person or institution practices all or part of a patented process. In the case of umbilical cord blood collection by an Obstetrician, the Court ruled that infringement occurs even if the cryopreservation and storage is performed by a third party.

---

[8] Exhs. 1, 2 and 5-7.

It is clear from this statement, that it was Mr. Didier's general business understanding that, after the three weeks of trial which culminated in a finding of willful infringement against all Defendants, and the subsequent entry of this Court's judgment (which it issued immediately after the jury returned its verdict), there had been a "ruling" in favor of PharmaStem and that infringement had occurred. Indeed, the jury found for PharmaStem and against each defendant, in response to Special Interrogatory No. 5 which read:

> Has PharmaStem proven that a Defendant has contributorily infringed the '553 patent by selling or offering to sell cryopreserved cord blood that was actually used by a third party in the direct infringement of any claims, 13, 19, 47, 53, or 57 of the '553 patent?[9]

The jury's finding in PharmaStem's favor in response to Special Interrogatory No. 5 was the message Mr. Didier intended to convey in the PharmaStem Letter. Had Defendants chosen to be fully forthcoming rather than simply anxious to taint PharmaStem in the eyes of this Court while post-trial motions are pending, Defendants would have not omitted the fact that, in the very same letter, PharmaStem stated that "[A]n injunction [if granted] would prevent the *infringing companies* from continuing their cord blood storage activities." PharmaStem Letter (emphasis added). This sentence makes it clear that, in PharmaStem's view, the jury's verdict was directed at the infringing Defendants, not at obstetricians.

Thus, the PharmaStem Letter does not knowingly contain false or misleading statements regarding the Delaware Action, but rather expresses a layperson's basic understanding of effect of the jury's verdict of willful patent infringement, and, indeed, every count in favor of PharmaStem.

---

[9] Exh. 8.

### C.    The PharmaStem Letter Did Not Contain False Or Misleading Statements Regarding The Law.

Defendants take particular exception, both to statements actually made in the PharmaStem Letter, and to statements *not* made in the PharmaStem Letter. Specifically, Defendants contend that the two sentences, "Patent infringement occurs when a person or institution practices all or part of a patented process. In the case of umbilical cord blood collection by an Obstetrician, the Court ruled that infringement occurs even if the cryopreservation and storage is performed by a third party," are false, inaccurate, and misleading. Defendants' Motion at 8-9. As shown above, Defendants take this sentence out of context and submit it to an unreasonable and unsustainable interpretation. Moreover, Defendants particularly object to PharmaStem's purported failure to include all of the "elements" of contributory infringement. However, as shown herein, the inclusion of the "elements" of contributory infringement described by Defendants is completely inapposite.

As a preliminary matter, the PharmaStem Letter simply does not go into so much detail as to dissect all possible theories of patent infringement. It is a letter, not a treatise. Nowhere does the PharmaStem Letter purport to offer an analysis of the various species of dependent infringement. Thus, with respect to PharmaStem's patents—three of which were not even at issue in this litigation—PharmaStem accurately stated that "infringement occurs even if the cryopreservation and storage is performed by a third party." Defendants clearly take issue with this assertion. However, such an assertion is neither untrue nor inaccurate. Notably, the statement does not further parse such dependent infringement into the subspecies of inducement of infringement or contributory infringement. For this independent reason alone, Defendants' single-minded focus on rehashing its post-trial arguments regarding contributory infringement is inapposite to the issues they raise.

Regardless, it is indisputable that the jury returned a verdict of contributory infringement of the '553 patent against Defendants who only provided services with respect to some, but not all, of the patented processes and methods. The jury's verdict was consistent with the great weight of the evidence and the special interrogatory contained in the Special Verdict Form. Materially, and as discussed *infra*, the jury's finding that certain Defendants contributorily infringed a method patent when such Defendants performed only part of the patented process or method, so long as all the steps of the patented process were completed by parties acting in concert or working together, is also consistent with the law. Thus, PharmaStem reasonably and in good faith believed that the obstetricians who collect cord blood for use by unlicensed cord blood banks may have some exposure to liability for dependent infringement, to the extent they are similarly situated to the Defendants in this case who also do not personally perform all the steps of the patent processes. Indeed, obstetricians that perform the collection of umbilical cord blood do so working together with cord blood banks, and perform only part of the patented process or method, with the remaining steps of the patented process performed by other parties. Defendants are well aware of this fact since they work closely with obstetricians, entering into contractual relationships and paying the obstetricians for their services.[10]

---

[10] Indeed, ViaCord (ViaCell) has an "exclusive agreement" with the Obstetrical and Gynecological Associates, P.A., under which "all patients will receive obstetrical counseling and education regarding the value of umbilical cord blood stem cells and the opportunity for their collection and long-term storage." Exh. 9 (select Obstetrical and Gynecological Associates, P.A. webpages). The Obstetrical and Gynecological Associates, P.A. webpage states that "[Obstetrical and Gynecological Associates, P.A.] are very pleased to be ***working closely with Viacord,*** a leading company in UCB stem cell preservation." *Id.* (emphasis added). ViaCord has also instituted "The ViaCord Patient Education Alliance" which supports obstetricians with educating patients about cord blood preservation, and appears to provide payment to the obstetricians for such services. Exh. 10. The program appears to provide payment to obstetricians for their collection of the umbilical cord blood, which may indicate the obstetricians are selling the cord blood, or the service of its collection, to the cord blood banks. Exh 10 (noting that the program offers a "reimbursement hotline support and reimbursement guarantee" to obstetricians, and "reimbursement for administrative efforts" to obstetrics practices.) CBR also pays obstetricians for the cord blood collected, as evidenced by its webpage

1.      **The Court's Preliminary Injunction Is Untenable.**

Defendants' proposed order, as adopted by this Court, without modification, is both problematic and untenable. Among other things, Defendants request that the Court find that the statement that "[p]atent infringement occurs when a person or institution practices all or part of a patented process" "is misleading because it is black letter law that in order to prove contributory infringement of a method patent, the <u>entire</u> patented process must be performed." Order at 1. PharmaStem does not dispute the requirement that "the entire patented process must be performed," but such statement cannot be taken in isolation from the sentence immediately following it in the same paragraph: "In the case of umbilical cord blood collection by an Obstetrician, the Court ruled that *infringement occurs even if the cryopreservation and storage is performed by a third party*." While, perhaps, not technically perfect, the substance of PharmaStem's two sentences, appearing contiguously in the same paragraph, is true with respect to third parties who do not perform all of the steps of the patent process. Such third parties can be found to contributorily infringe or induce the infringement of patent processes. Indeed, and further discussed below, infringement of a patented process or method cannot be avoided by having another perform one step of the process or method.

With respect to the Defendants' request that the Court find that the statement that "[i]n the case of umbilical cord blood collection by an Obstetrician, the Court ruled that infringement occurs even if the cryopreservation and storage is performed by a third party" is "misleading" because "[t]his Court never made any rulings regarding conduct by

---

directed only to "Obstetrical Caregivers" (Exh. 11) and another webpage setting forth the billing process, billing codes and reimbursement information for obstetrical caregivers that work with CBR. Exh. 12. Cryo-Cell also a webpage dedicated to Medical Caregivers (Exh. 13) as well as a Obstetrical Caregiver's Guide to Cord Blood Banking which states that Cryo-Cell reimburses for collection fees up to a specified amount (Exh. 14). Cryo-Cell also wrote a letter to care providers who collect on behalf of Cryo-Cell clients (Exh. 15). Also, CorCell's Participation Agreements instructs clients on how to coordinate with the healthcare provider collecting the cord blood. (Exh. 16).

obstetricians," Order at 1. PharmaStem does not dispute this fact, nor does it state in the letter that the jury Court found that obstetricians infringe the two PharmaStem patents at issue in the Delaware proceedings. The PharmaStem Letter undeniably clarifies that such third party infringers were among Defendants, not obstetricians. In addition, PharmaStem has been careful not to threaten any obstetricians with a lawsuit, nor put them in reasonable apprehension of one. Instead, PharmaStem has only notified them of its patents, fairly appraised them on the results of the recently concluded jury trial, and offered at least a clear path to guaranteed non-liability, *i.e.*, working only with licensed cord blood banks. One must remember that PharmaStem's patents are presumed valid and enforceable by statute. It would be an absurd outcome indeed, if PharmaStem had to treat its patents more delicately after a jury unanimously affirmed the validity, enforceability and willful infringement by Defendants of two of PharmaStem's five patents. Such an absurd result is not sanctioned by law, nor the All Writs Act. Regardless, especially in light of the nature of some of the relationships between obstetricians and defendants, PharmaStem may have a colorable claims against such obstetricians under various theories of dependent liability.

With respect to the Court's Preliminary finding, as proposed by Defendants, that the above-mentioned statement is "misleading" because it "leaves out several important elements that must be proved to show contributory infringement... includ[ing] ... that, under §271(c), a sale of a service, as opposed to a sale of a tangible physical object, is not sufficient to satisfy the requirements of the contributory infringement statute," the Court's finding makes it legally impossible to contributorily infringe a process or method patent. Order at 2. While Defendants would like such a sweeping statement to be true, and, thus, self-servingly rehash their JMOL arguments, PharmaStem restates that it has never agreed with Defendants' view of the law of contributory infringement and that, in any case, Defendants proposed, fought for, and won, and the Court adopted, the now controverted parts of the special interrogatory regarding contributory infringement put

before the jury. In particular, the alleged offending special verdict question was adopted verbatim from ViaCell's proposed jury verdict form.[11]

Based on this Court's recent Order (as drafted by Defendants), the legal theory of contributory infringement does not apply to method or process patents. By stating that 35

---

[11] *See Neely v. Club Med Management Services, Inc.*, 63 F.3d 166, 200 (3d Cir. 1995)("where defendant [approves or] fails to object to the form and language of special verdict forms or to the jury charges, before closing arguments or at the close of charging before the jury retires to deliberations, and the form had been submitted to counsel, objections are waived"); *Allen Organ Co. v. Kimball Int'l, Inc.*, 839 F.2d 1556,1561 (Fed. Cir. 1988) ("[where] record shows no objection by [movant] to the instructions or interrogatories on the basis of potential confusion of the jury in resolving these questions... [w]e conclude that the district court was correct in holding that [movant] had waived its post-verdict challenges to the jury instructions and to the questions that were presented to the jury"); *Mitsubishi Electric Corp. v. Ampex Corp.*, 190 F.3d 1300, 1304 (Fed. Cir. 1999) (party waives objection by acquiescing and proposing the verdict form), *citing Hoechst Celanese Corp. v. BP Chemicals, Ltd.*, 78 F.3d 1575, 1581 (Fed. Cir. 1996).

In the case at hand, it cannot be disputed that:

- The jury's verdict on contributory infringement complied literally with the form of special verdict and, accordingly, judgment was entered on that verdict;
- Defendants proposed, requested, approved, acquiesced in, and failed to object to the form and language of Question No. 5 of the jury verdict form and the relevant corresponding language in the jury instruction;
- Defendants' own speculation was that the "little bit different language" in their proposed verdict form and jury instruction was the "source of some confusion" for the jury, yet not only failed to do anything about it, but *objected* to doing anything about it; and,
- Defendants did not request the jury to be reconvened and reassembly was a distinct possibility.

Therefore the doctrine of invited error applies to deprive Defendants of standing to now complain about the confusion that it caused, invited, and acquiesced in. Moreover, Defendants' failure to demand resubmission to the jury after the verdict was returned, but before they were discharged, constitutes a second waiver or forfeiture. "If a slip has been made, the parties detrimentally affected must act expeditiously to cure it, not lie in wait and ask for another trial when matters turn out not to be to their liking." *Anderson v. Cryovac, Inc.*, 862 F.2d 910, 918 (1st Cir. 1988). Defendants attempt to circumvent their own error by lying in wait to repeatedly ask this Court for undeserved relief from the consequences of their own actions, gambles, and bets both in the history of their infringement of the Patents-in-Suit and in the course of litigation.

U.S.C. §271(c) is only satisfied by the sale of a tangible physical object, the Court has opened Pandora's Box for unabated infringement of all method or process patents because any potential infringer could avoid liability by merely paying a third party to perform the service of one or more steps of the patented process. This is clearly not the law.

A method or process claim is directly infringed by practicing the patented method. *Joy Technologies, Inc. v. Flakt, Inc.*, 6 F.3d 770, 775 (Fed. Cir. 1993). However, "a party cannot avoid liability for infringement by having someone else perform one or more steps of a patented process for them." *E.I. DuPont De Nemours and Co. v. Monsanto Co.*, 903 F. Supp. 680 (D. Del. 1995)(*aff'd* 92 F.3d 1208 (Fed. Cir. 1996 (Table)); See also, *Shields v. Halliburton Co.*, 493 F. Supp. 1376 (W.D. La 1980), *aff'd*, 667 F.2d 1232 (5th Cir. 1982)("[i]nfringement of a patented process or method cannot be avoided by having another perform one step of the process or method"); *Crowell v. Baker Oil Tools, Inc.*, 143 F. 2d 1003, 1004 (9th Cir. 1944)("It is obvious that one may infringe a patent if he employ an agent for that purpose or have the offending articles manufactured for him by an independent contractor."); *Metal Film Co. v. Metlon Corp.*, 316 F. Supp. 96, 110 n. 12 (S.D.N.Y 1970)("That defendants choose to have the vacuum metallizing, which was a conventional step ... done by outside suppliers does not mitigate their infringement of the overall process."); *Ralson Purina Co. v. Far-Mar-Co., Inc.*, 586 F. Supp. 1176, 1226 (D. Kan. 1984), *aff'd in part*, 772 F.2d 1570 (Fed. Cir. 1985)("it is well settled that a party cannot avoid infringement merely by having a third party practice one or more of the required steps").

PharmaStem had advocated, in accordance with, *inter alia, Cordis Corp. v. Medtronic, Inc.*, 194 F. Supp. 2d 323, 349 (D. Del. 2002), that Defendants' acts of supplying cryopreserved cord blood to transplanters was sufficient to support a finding of predicate direct infringement among the entities, so long as the supply was knowing, incapable of substantial noninfringing use, and actually used in an infringing manner.

24

Defendants' own experts testified that, in cases of actual transplants, cord blood banks and transplant physicians perform every step of the asserted claims of the '553 Patent. Because the heart of contributory infringement, as a cause of action, is liability under a theory of joint tortfeasance, Defendants' contributory infringement of the '553 Patent should not be a close question. *See Hewlett Packard Co. v. Bausch & Lomb Inc.*, 909 F.2d 1464 (Fed. Cir. 1990)(legislative history of Patent Act of 1952 indicates no substantive change in scope of what constituted contributory infringement at common law); *see also Dawson Chem. Co., et al. v. Rohm and Haas Co.*, 448 U.S. 176, 188-189 (1980)("the contributory infringement doctrine ... exists to protect patent rights from subversion by those who, without directly infringing the patent themselves, engage in acts designed to facilitate infringement by others... [t]his protection is of particular importance in situations ... where enforcement against direct infringers would be difficult, and where the technicalities of patent law make it relatively easy to profit from another's invention without risking a charge of direct infringement").

For the foregoing reasons, PharmaStem cannot agree with Defendants or the Court's adoptive position on the law of contributory infringement to the extent it precludes dependent or contributory infringement of process and method patents altogether. Such was clearly not the legislative intent behind the Patent Act of 1952. The division of dependent infringement into inducement of infringement and contributory infringement was meant to occupy the same space as the common law of patent infringement, sounding in tort, that came before it. *See Hewlett Packard Co. v. Bausch & Lomb Inc.*, 909 F.2d 1464 (Fed. Cir. 1990). PharmaStem respectfully submits that this Court should consider such larger questions of dependent patent infringement in the context of its roots in tort. Perhaps, then, it will become relatively easier to see that Defendants cannot so nicely nor neatly wriggle away from their tortious infringement of PharmaStem's intellectual property rights through litigious gamesmanship and faulty argument alone.

## **CONCLUSION**

For all of the above reasons, PharmaStem respectfully requests that the Court deny Defendants' Motion in its entirety and dissolve the Court's order of the preliminary injunction which was prematurely granted.

POTTER ANDERSON & CORROON LLP

OF COUNSEL:

Paul J. André                    By: _Philip A. Rovner/mcc_
Lisa Kobialka                         Philip A. Rovner (#3215)
Perkins Coie LLP                      Hercules Plaza
101 Jefferson Drive                   P.O. Box 951
Menlo Park, CA 94025                  Wilmington, DE  19899
(650) 838-4300                        (302) 984-6000

Dated:  July 7, 2004              Attorneys for Plaintiff
641646                            PharmaStem Therapeutics, Inc.

## CERTIFICATE OF SERVICE

I hereby certify that, on July 7, 2004, true and correct copies of the within document were served on the following counsel of record at the addresses and in the manner indicated:

**BY HAND DELIVERY**

Jeffrey L. Moyer, Esq.
Richards, Layton & Finger
One Rodney Square
P. O. Box 551
Wilmington, DE  19899

Robert F. Stewart, Jr., Esq.
Dilworth Paxson LLP
First Federal Plaza, Suite 500
Wilmington, DE  19899

Richard D. Kirk, Esq.
Morris, James, Hitchens & Williams
222 Delaware Avenue
10th Floor
P.O. Box 2306
Wilmington, DE  19899

**BY FEDERAL EXPRESS**

William F. Abrams, Esq.
Chang H. Kim, Esq.
Pillsbury Winthrop LLP
2475 Hanover Street
Palo Alto, CA  94304

James J. Rodgers, Esq.
Dilworth Paxson LLP
3200 Mellon Bank Center
1735 Market Street
Philadelphia, PA  19103

Paul F. Ware, Jr., P.C.
Goodwin Procter, LLP
Exchange Place
Boston, MA 02109-2881

Philip A. Rovner